[No. 32411.   *En Banc.*   October 14, 1953.]

THE CITY OF TACOMA, *Appellant,* v. THE TAXPAYERS OF
TACOMA, *Respondents,* ROBERT SCHOETTLER, *as State
Director of Fisheries, et al., Respondents and
Cross-appellants.*[1]

[1]Reported in 262 P. (2d) 214.

*Clarence M. Boyle, J. D. Barline,* and *E. K. Murray,* for appellant.

*Copeland & Tollefson,* for respondents.

*The Attorney General* and *Lee Olwell, Harold A. Pebbles,* and *William E. Hicks, Special Assistants,* for respondents and cross-appellants.

DONWORTH, J.—This action was instituted by the city of Tacoma against the taxpayers of Tacoma and the directors of game and fisheries of the state of Washington, under the provisions of RCW 7.24.010 *et seq.* [*cf.* Rem. Rev. Stat. (Sup.), § 784-1, *et seq.*], relating to declaratory judgments, and RCW 7.24.150 *et seq.* [*cf.* Rem. Rev. Stat. (Sup.), § 5616-11 *et seq.*] providing for testing and determining the validity of a proposed bond issue.

The purpose of the suit was to determine plaintiff's right to issue and sell certain utility bonds to finance the construction of two power dams on the Cowlitz river in Lewis county, Washington, as provided by its ordinance No. 14386, and particularly to determine whether chapter 9, Laws of 1949,

p. 38 [*cf.* RCW 75.20.010 *et seq.*], or §§ 46 and 49, pp. 272, 274, chapter 112, Laws of 1949 [*cf.* RCW 75.20.050 and 75.20.100], or any other law of the state of Washington is a bar to such construction and to the issuance and sale of the bonds.

Pursuant to the provisions of RCW 7.24.150, the superior court for Pierce county appointed certain citizens and taxpayers to represent all taxpayers of the city of Tacoma as defendants in the suit. The defendant taxpayers demurred to the complaint. The directors of game and fisheries filed an amended answer and cross-complaint, denying the material allegations of the complaint, and by way of affirmative defense and cross-complaint alleged that the contemplated dam construction was illegal under state law. The directors prayed that ordinance No. 14386 of the city of Tacoma be adjudged unlawful and that plaintiff be perpetually enjoined from constructing the dams. Plaintiff demurred to the amended answer and cross-complaint.

By stipulation of the parties and order of the superior court for Pierce county, the venue of the case was transferred to the superior court of Thurston county. That court heard arguments and sustained the taxpayers' demurrer to the complaint on the ground that it failed to state a cause of action and stated in its order of dismissal that this ruling substantially disposed of the entire matter and made it unnecessary to consider plaintiff's demurrer to the cross-complaint. Upon plaintiff's election to stand on its complaint, the court dismissed the action with prejudice.

Plaintiff has appealed from the judgment of dismissal. Defendant directors have cross-appealed from the court's refusal to enter an order overruling plaintiff's demurrer to their amended cross-complaint and its refusal to enter findings of fact, conclusions of law, and judgment against plaintiff.

For purposes of this appeal, the city of Tacoma will be referred to as appellant, the taxpayers of Tacoma will be referred to as respondents, and the directors of game and fisheries as cross-appellants.

The facts alleged in appellant's complaint which are necessary to an understanding of this controversy are these:

On August 6, 1948, appellant filed with the Federal power commission its declaration of intention to construct two power dams on the Cowlitz river in the state of Washington, pursuant to § 23 (b) of the Federal power act (16 U. S. C. A. § 817).

Thereafter, on December 28, 1948, it filed with the power commission an application for a Federal license to construct these dams (project No. 2016). The smaller dam, as proposed, is to be located at mile 52 on the Cowlitz river, about a mile southeast of the town of Mayfield. It is to be approximately 185 feet in height above tailwater, have a storage capacity of approximately 127,000 acre feet, and have a powerhouse with an installed capacity of 120,000 kilowatts in three units.

The larger dam, as proposed, is to be constructed at mile 65 on the same river, approximately two and one-half miles east of the town of Mossyrock. This dam is to be approximately 325 feet above tailwater, have a storage reservoir with a capacity of approximately 1,375,000 acre feet and a powerhouse with an installed capacity of 225,000 kilowatts in three units. Provisions were made for expansion of the kilowatt output on each plant if necessary.

On March 8, 1949, the power commission made the following preliminary findings:

"(1) Construction and operation of the project proposed by the declarant would affect public lands or reservations of the United States.

"(2) Boats have navigated the Cowlitz River to Toledo and during high water stages boats have navigated the river for some distance above Toledo.

"(3) The United States has improved the Cowlitz River by snagging, dredging and regulating works from its mouth to Toledo to obtain a minimum navigable depth of 2½ feet.

"(4) The Cowlitz River from its point of junction with the Columbia River to at least Toledo is a navigable water of the United States and may be a navigable water of the United States for some distance upstream from Toledo.

"(5) Either or both of the proposed reservoirs would have sufficient usable storage capacity to enable either or both

of them to be operated in such a manner as to materially affect the water stage in the Cowlitz River at Toledo or below, which section of the river we have found to be a navigable water of the United States, and thus the construction of either or both of the proposed reservoirs would materially affect the navigable capacity of the Cowlitz River.

"(6) The interests of interstate or foreign commerce would be affected by the construction and operation of either or both of the reservoirs proposed by the declarant."

These findings were followed by an order requiring appellant to secure a license under the provisions of the Federal power act before commencing construction of either of the proposed dams.

The power commission thereafter conducted extended hearings on appellant's application for a Federal license, at which hearings the departments of fisheries and of game of the state of Washington participated as interveners, along with other interested groups.

Under date of November 28, 1951, the power commission issued its opinion (No. 221) and order issuing the license to appellant. The order recited sixty-six findings of fact and then stated:

"The Commission orders:

"(A) This license is issued to the City of Tacoma, Washington, under Section 4 (e) of the Act for a period of 50 years, effective as of the first day of the month in which the accepted license is filed with the Commission by the Licensee, for the construction, operation and maintenance of Project No. 2016 upon the Cowlitz River, a stream over which Congress has jurisdiction, and upon lands of the United States, subject to the terms and conditions of the Act which is incorporated by reference as a part of this license, and subject to such rules and regulations as the Commission has issued or prescribed under the provisions of the Act.

"(B) This license is also subject to the terms and conditions set forth in Form L-6 entitled 'Terms and Conditions of License for Unconstructed Major Project Affecting Navigable Waters and Lands of the United States,' which terms and conditions are attached hereto and made a part hereof;

and subject to the following special conditions set forth herein as additional articles:

[Here follow Articles 28 to 35, inclusive.]

"(C) The exhibits specified in paragraph (63) above are approved as part of this license.

"(D) This order shall become final 30 days from the date of its issuance unless application for rehearing shall be filed within the 30-day period provided by Section 313 (a) of the Act.

"(E) This license shall be accepted and returned to the Commission within 60 days from date of issuance of this order."

Appellant by authority of its city council formally accepted all the provisions, terms, and conditions of this license on December 28, 1951.

On December 26, 1951, the departments of fisheries and of game and the Washington State Sportsmen's Council, Inc., filed an application for rehearing. This application was denied by the power commission on January 22, 1952, in an order stating in part:

"The Interveners appear to be under the impression that the Commission failed to consider the proposed Cowlitz Project in relation to the Columbia Basin as a whole. As shown by the numerous specific findings in the opinion and order issued November 28, 1951, the Commission considered and analyzed the evidence as related specifically to the Cowlitz Project alone and as related to the comprehensive development of the entire Columbia River Basin. It was only after the Commission had examined all the plans in evidence relating to the comprehensive development of the Pacific Northwest Region that it reached the conclusion that the Cowlitz Project was best adapted to a comprehensive plan for developing the Columbia River watershed for the use and benefit of interstate commerce and the other beneficial public uses."

On January 9, 1952, appellant's city council duly enacted ordinance No. 14386 (which became effective January 20, 1952), in which it adopted the plan and system therein described and designated as the Cowlitz power development as an addition to, and an extension of, its existing facilities for the generation and distribution of electric energy. This ordinance authorized the construction of the Mossyrock and

Mayfield dams and, to provide the necessary additional funds, authorized the issuance and sale of utility revenue bonds, from time to time, not exceeding the total principal amount of $146,000,000. There was included in the ordinance the following:

"The construction of this project has been licensed by the Federal Power Commission under Project No. 2016, and the construction herein authorized shall conform with the requirements of such license.

"Section 3. That the entire improvement consisting of the additions and betterments to and extensions of the said existing electric generating plant and system shall be known and designated as Cowlitz Power Development. That the total estimated cost of said Development declared as near as may be is the sum of $146,000,000.00."

Appellant's complaint, containing the allegations which we have summarized above, was verified February 6, 1952.

The cross-appellants state in their brief that a petition for review of the orders of the power commission involved in this case has been filed by them in the circuit court of appeals for the ninth circuit (being cause No. 13289), and that the matter is now pending in that court. Consequently, the license issued to appellant is still in litigation and has not become effective. Nevertheless, the present case has been submitted by the parties to this court and we deem it proper to decide it on the record presented to us.

[Subsequent to the preparation of this opinion, the circuit court of appeals on October 5, 1953, rendered its decision declining to interfere with the power commission's order. See *Washington Department of Game v. Federal Power Comm.*, 207 F. (2d) 391.]

■ The first question to be considered is whether appellant's complaint states a cause of action. On this appeal, the demurrer admits all facts well pleaded and reasonable inferences to be drawn therefrom. *Slater v. Bird,* 40 Wn. (2d) 848, 246 P. (2d) 460, and cases cited.

Thus it is admitted that the power commission found that appellant's proposed project will affect the navigability of at least part of the Cowlitz river, which it has

determined to be a navigable water of the United States; that it will affect the interests of interstate commerce; that it will affect public lands or reservations of the United States, and that, therefore, the project is thus within the jurisdiction of the Federal power commission under the Federal power act. It is further admitted that the power commission has rendered its opinion No. 221 and has issued its license in the form attached to the complaint as exhibit "D".

The question presented is whether appellant, having complied with all applicable Federal laws and possessing a license issued by the Federal power commission, is barred from constructing the project because of certain laws of the state of Washington relating to the protection of fish.

The two acts principally relied upon by respondents and cross-appellants as barring appellant's construction of this project were enacted in 1949. They are:

(1) The Columbia river fish sanctuary act (Chapter 9, Laws of 1949).

This act is entitled:

"AN ACT relating to the protection of anadromous fish life in the rivers and streams tributary to the lower Columbia River and declaring an emergency."

Section 1 of the act [cf. RCW 75.20.010] reads:

"All streams and rivers tributary to the Columbia River downstream from McNary Dam are hereby reserved as an anadromous fish sanctuary against undue industrial encroachment for the preservation and development of the food and game fish resources of said river system and to that end there shall not be constructed thereon any dam of a height greater than twenty-five (25) feet that may be located within the migration range of any anadromous fish as jointly determined by the Director of Fisheries and the Director of Game, nor shall waters of the Cowlitz River or its tributaries or of the other streams within the sanctuary area be diverted for any purpose other than fisheries in such quantities that will reduce the respective stream flows below the annual average low flow, as delineated in existing or future United States Geological Survey reports: *Provided,* That when the flow of any of the streams referred to in this section is below the annual average, as delineated in existing

or future United States Geological Survey reports, water may be diverted for use, subject to legal appropriation, upon the concurrent order of the Director of Fisheries and Director of Game."

Section 2 requires cross-appellants to acquire and abate any dam on any stream which may be in conflict with § 1. Section 3 exempts dams on two named rivers, and § 4 declares an emergency.

(2) Chapter 112, Laws of 1949, known as the Fisheries code of the state of Washington.

Section 46 thereof [cf. RCW 75.20.050] provides:

"It is hereby declared to be the policy of this state that a flow of water sufficient to support game fish and food fish populations be maintained at all times in the streams of this state.

"The Supervisor of Hydraulics shall give the Director of Fisheries and the Director of Game notice of each application for a permit to divert water, or other hydraulic permit of any nature, and the Director of Fisheries and Director of Game shall have thirty (30) days after receiving said notice in which to state their objections to the application, and the permit shall not be issued until the thirty (30) days period provided for herein has elapsed.

"The Supervisor of Hydraulics may refuse to issue any permit to divert water, or any hydraulic permit of any nature, if, in the opinion of the Director of Fisheries or Director of Game, such a permit might result in lowering the flow of water in any stream below the flow necessary to adequately support food fish and game fish populations in the stream.

"The provisions of this section shall in no way affect existing water rights."

Section 49 thereof [cf. RCW 75.20.100] provides:

"In the event that any person or government agency desires to construct any form of hydraulic project or other project that will use, divert, obstruct or change the natural flow or bed of any river or stream or that will utilize any of the waters of the state or materials from the stream beds, such person or government agency shall submit to the Department of Fisheries and the Department of Game full plans and specifications of the proposed construction or work, complete plans and specifications for the proper protection of fish life in connection therewith, the approxi-

mate date when such construction or work is to commence and shall secure the written approval of the Director of Fisheries and the Director of Game as to the adequacy of the means outlined for the protection of fishlife in connection therewith and as to the propriety of the proposed construction or work and time thereof in relation to fish life, before commencing construction or work thereon. If any person or government agency shall commence construction on any such works or projects without first providing plans and specifications subject to the approval of the Director of Fisheries and the Director of Game for the proper protection of fish life in connection therewith and without first having obtained written approval of the Director of Fisheries and the Director of Game as to the adequacy of such plans and specifications submitted for the protection of fish life, he shall be guilty of a gross misdemeanor. If any such person or government agency be convicted of violating any of the provisions of this act and continues construction on any such works or projects without fully complying with the provisions of this act, such works or projects are hereby declared a public nuisance and shall be subject to abatement as such. . . ."

Respondents and cross-appellants contend that these statutes are a valid exercise of the police power of the state to preserve its fishery resources for the common welfare of its citizens and must be complied with before appellant can proceed with the construction of its project.

In order to pass upon the validity of these state laws, it is necessary to review in some detail the provisions and constitutional background of the Federal water power act.

In 1920, Congress passed that act, which created the Federal power commission, with authority to license projects to develop the navigable waters of the United States. This was a major undertaking and was the outgrowth of a widely supported effort of the conservationists to secure enactment of a comprehensive plan of national regulation which would promote the integrated development of the water resources of the nation, to the extent that it was within the Federal power to do so. *First Iowa Hydro-Electric Cooperative v. Federal Power Commission,* 328 U. S. 152, 90 L. Ed. 1143, 66 S. Ct. 906 (which is the leading case on this subject to which extended reference will be made later).

The Federal water power act of 1920, as amended, was incorporated into the Federal power act in 1935. (16 U. S. C. A. §§ 791a-823.) The sections of the act which are particularly pertinent to the present controversy are set forth below.

Section 3 of the act (16 U. S. C. A. § 796) defines certain words, including "licensee," "municipality," "navigable waters," and "municipal purposes," which have a bearing upon our present problem.

Section 4 (16 U. S. C. A. § 797), defining the commission's authority and powers, provides in subsection (e):

"(e) To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided: . . ."

Section 9 (16 U. S. C. A. § 802), prescribing information to be furnished the power commission by the applicant, includes in subsection (b) the following:

"(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this chapter."

Section 10 (16 U. S. C. A. § 803) provides the conditions

upon which a license shall be issued by the power commission. Subsection (a) provides:

"(a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."

Section 23 (b) (16 U. S. C. A. § 817) so far as is pertinent reads:

". . . Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter. . . ."

Section 27 (16 U. S. C. A. § 821) contains the following provisions:

"Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

The Federal power act was considered by the supreme court of the United States in *United States v. Appalachian*

*Electric Power Co.,* 311 U. S. 377, 85 L. Ed. 243, 61 S. Ct. 291, where the extent of the control of the Federal government over navigable streams was defined. The attorneys general of forty-one states (including the state of Washington) filed a brief as *amici curiae,* in which they contended that the power of the government to control the erection of structures in such streams did not include the power to prescribe conditions not related to navigation. The court stated the relationship between Federal and state control over navigable streams to be as follows:

"The power of the United States over its waters which are capable of use as interstate highways arises from the commerce clause of the Constitution. 'The Congress shall have Power . . . To regulate Commerce . . . among the several States.' It was held early in our history that the power to regulate commerce necessarily included power over navigation. To make its control effective the Congress may keep the 'navigable waters of the United States' open and free and provide by sanctions against any interference with the country's water assets. It may legislate to forbid or license dams in the waters; its power over improvements for navigation in rivers is 'absolute.'

"The states possess control of the waters within their borders, 'subject to the acknowledged jurisdiction of the United States under the Constitution in regard to commerce and the navigation of the waters of rivers.' It is this subordinate local control that, even as to navigable rivers, creates between the respective governments a contrariety of interests relating to the regulation and protection of waters through licenses, the operation of structures and the acquisition of projects at the end of the license term. But there is no doubt that the United States possesses the power to control the erection of structures in navigable waters."

The court upheld the conditions in the license to which objection had been made and again referred to the power of the government, saying:

"The respondent is a riparian owner with a valid state license to use the natural resources of the state for its enterprise. Consequently it has as complete a right to the use of the riparian lands, the water, and the river bed as can be obtained under state law. The state and respondent, alike, however, hold the waters and the lands under them

subject to the power of Congress to control the waters for the purpose of commerce. The power flows from the grant to regulate, i.e., to 'prescribe the rule by which commerce is to be governed.' This includes the protection of navigable waters in capacity as well as use. This power of Congress to regulate commerce is so unfettered that its judgment as to whether a structure is or is not a hindrance is conclusive. Its determination is legislative in character. The Federal Government has domination over the water power inherent in the flowing stream. It is liable to no one for its use or non-use. The flow of a navigable stream is in no sense private property; 'that the running water in a great navigable stream is capable of private ownership is inconceivable.' Exclusion of riparian owners from its benefits without compensation is entirely within the Government's discretion.

"Possessing this plenary power to exclude structures from navigable waters and dominion over flowage and its product, energy, the United States may make the erection or maintenance of a structure in a navigable water dependent upon a license. This power is exercised through § 9 of the Rivers and Harbors Act of 1899, [33 USCA § 401], prohibiting construction without congressional consent and through § 4 (e) of the present Power Act, [16 USCA § 797 (e)]. . . .

"The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the Federal Government. The license conditions to which objection is made have an obvious relationship to the exercise of the commerce power. Even if there were no such relationship the plenary power of Congress over navigable waters would empower it to deny the privilege of constructing an obstruction in those waters. It may likewise grant the privilege on terms. It is no objection to the terms and to the exertion of the power that 'its exercise is attended by the same incidents which attend the exercise of the police power of the states.' The Congressional authority under the commerce clause is complete unless limited by the Fifth Amendment."

Appellant argues that chapter 9, Laws of 1949, §§ 46 and 49 of chapter 112, Laws of 1949, and other related statutes are in direct conflict with § 10 (a) of the Federal power act requiring the project adopted to be *"such as in the judg-*

*ment of the Commission will be best adapted to a compre-
hensive plan . . . for the improvement and utilization
of waterpower development, and for other beneficial public
uses."*

Chapter 9, Laws of 1949, purports to (1) prohibit the building of any dam of a height greater than twenty-five feet and (2) prohibit the diversion of waters for any purpose other than fisheries, upon the Cowlitz river.

Section 46 of chapter 112 purports to authorize the supervisor of hydraulics to refuse to issue a permit to divert water, or any hydraulic permit of any nature, if in the opinion of cross-appellants the issuance thereof might result in lowering the water in any stream below the flow necessary to support the food and game fish population.

Section 47 of chapter 112 purports to require the owner or person in charge of a dam or other obstruction to provide such fish ladders or fishways as the director of fisheries may approve.

Section 48 of chapter 112 purports (in the event that the director of fisheries determines that fish ladders and fishways are impracticable) to require the person or agency who desires to build a dam or other hydraulic project to (1) convey to the state a site or sites satisfactory to the director of fisheries, erect thereon fish hatcheries suitable to the director, and provide the money necessary for operation and maintenance, or (2) pay to the state such money as the director may determine is necessary to expand, maintain, and operate additional facilities at existing hatcheries.

Section 49 of chapter 112 purports to require the written approval of cross-appellants as to the adequacy of plans and specifications for protection of fish life and as to the propriety of the proposed project and time of construction thereof in relation to fish life, before construction of the project is commenced.

Violations of §§ 47, 48 and 49 are declared to be gross misdemeanors and penalties are provided.

It is obvious that compliance with the fish sanctuary act would force abandonment of the Cowlitz power develop-

ment project by appellant, and that compliance with these provisions of the Fisheries code would give cross-appellants a veto power over the power commission's right to issue appellant a license for its construction. Hence, the two state laws are in direct conflict with the Federal act, in so far as this project is concerned.

Respondents and cross-appellants, on the other hand, contend that these laws were passed for the express purpose of preserving the fisheries resources of the state and are a valid exercise of the police power. They point out that it has often been held that a state may validly enact regulations for the preservation of game and fish in the exercise of the police power. *Skiriotes v. Florida,* 313 U. S. 69, 85 L. Ed. 1193, 61 S. Ct. 924; *Foster-Fountain Packing Co. v. Haydel,* 278 U. S. 1, 73 L. Ed. 147, 49 S. Ct. 1; *State v. Towessnute,* 89 Wash. 478, 154 Pac. 805; *State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P. (2d) 24.

It may be conceded that fish in the waters of the state belong to the people of the state in their sovereign capacity, that the legislature may permit or prohibit the taking thereof, and that the Federal government has no ownership of, or power to regulate the taking of, fish in navigable waters. See *Davis v. Olsen,* 128 Wash. 393, 222 Pac. 891. Nevertheless, where these state laws are in direct conflict with the Federal power act, they are invalid under the terms of the supremacy clause contained in article VI of the United States constitution. This provision reads:

"This constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

Where, as here, the state and Federal acts cannot be reconciled or consistently stand together, the action of a state even under its police power must give way. The language used by the court in *Morris v. Jones,* 329 U. S. 545, 91 L. Ed. 488, 67 S. Ct. 451, 168 A. L. R. 656, relating to an

analogous situation, is applicable to this case. It was there said:

"This is to argue that by reason of its police power a State may determine the method and manner of proving claims against property which is in its jurisdiction and which is being administered by its courts or administrative agencies. We have no doubt that it may do so except as such procedure collides with the federal Constitution or an Act of Congress. See *Broderick v. Rosner,* 294 U. S. 629. *But where there is such a collision, the action of a State under its police power must give way by virtue of the Supremacy Clause.* Article VI, Clause 2. There is such a collision here." (Italics ours.)

But respondents and cross-appellants argue that, assuming the supremacy of the Federal power act, Congress in enacting it did not intend to exclude the state from exercising jurisdiction and control over the fisheries resources of the state. In support of their argument that appellant must comply with the state laws protecting the fisheries resources, they cite §§ 9 (b) and 27 of the Federal power act, which we have quoted above.

Because we are of the opinion that the principal issues of law involved in this case (both as to the constitutional question and the correct interpretation of § 9 (b) and § 27 of the act) are controlled by the decision of the supreme court of the United States in *First Iowa Hydro-Electric Cooperative. v. Federal Power Commission, supra,* we will discuss this case in some detail.

In that case, the Cooperative had applied to the power commission for a license to construct a dam on the Cedar river near Moscow, Iowa, and divert all of the water (except about twenty-five second feet) from the river bed below the dam by means of an eight mile diversion canal to Muscatine on the Mississippi river, where a hydro-electric plant was to be constructed. This was a radical change. In its natural state, the Cedar river continued to flow southeasterly from the dam site for a distance of twenty-nine miles, where it flowed into the Iowa river, which, in turn, after traveling an equal distance, flowed into the Mississippi river about twenty miles below Muscatine.

After the power commission made its jurisdictional findings, the state of Iowa intervened and opposed the granting of a license on the ground that the Cooperative had no permit from the executive council of the state as required by the Iowa statute. The Cooperative had applied for such permit and it had been denied by the executive council.

The two sections of the 1939 Code of Iowa, which were the principal basis of the state's objection to the issuance of a license by the power commission, provided:

"7767. Prohibition-permit. No dam shall be constructed, maintained, or operated in this state in any navigable or meandered stream for any purpose, or in any other stream for manufacturing or power purposes, nor shall any water be taken from such streams for industrial purposes, unless a permit has been granted by the executive council to the person, firm, corporation, or municipality constructing, maintaining, or operating the same."

"7771. When permit granted. If it shall appear to the council that the construction, operation, or maintenance of the dam will not materially obstruct existing navigation, or materially affect other public rights, will not endanger life or public health, and any water taken from the stream in connection with the project is returned thereto at the nearest practicable place *without being* materially diminished in quantity or polluted or *rendered deleterious to fish life,* it shall grant the permit, upon such terms and conditions as it may prescribe." (Italics ours.)

It was the state's contention that, under § 9 (b) and § 27 of the Federal power act, an applicant was required to comply with state laws before being entitled to the issuance of a license from the power commission. The power commission sustained the state's position and denied the Cooperative a license.

The case in due course was considered on certiorari by the supreme court of the United States, which overruled the contentions of the state of Iowa and remanded the matter to the power commission for further proceedings in conformity with the court's opinion.

The court interpreted the provisions of the Federal power act and concluded that chapter 363 (now chapter 469) of the Code of Iowa, and especially §§ 7767 and 7771, as quoted

above, need not be complied with by an applicant for a Federal license. The court said:

"In the Federal Power Act there is a separation of those subjects which remain under the jurisdiction of the States from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act. To the extent of this separation, the Act establishes a dual system of control. The duality of control consists merely of the division of the common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction. The duality does not require two agencies to share in the final decision of the same issue. Where the Federal Government supersedes the state government there is no suggestion that the two agencies both shall have final authority. In fact a contrary policy is indicated in §§ 4 (e), 10 (a), (b) and (c), and 23 (b). In those sections the Act places the responsibility squarely upon federal officials and usually upon the Federal Power Commission. A dual final authority, with a duplicate system of state permits and federal licenses required for each project, would be unworkable. 'Compliance with the requirements' of such a duplicated system of licensing would be nearly as bad. Conformity to both standards would be impossible in some cases and probably difficult in most of them. The solution adopted by Congress, as to what evidence an applicant for a federal license should submit to the Federal Power Commission, appears in § 9 of its Act. It contains not only subsection (b) but also subsections (a) and (c). Section 9 (c) permits the Commission to secure from the applicant 'Such additional information as the commission may require.' This enables it to secure, *in so far as it deems it material,* such parts or all of the information that the respective States may have prescribed in state statutes as a basis for state action. The entire administrative procedure required as to the present application for a license is described in § 9 and in the Rules of Practice and Regulations of the Commission."

The following language answers respondents' and cross-appellants' contention that appellant must comply with the fish sanctuary act and the Fisheries code of 1949 in order to construct the Cowlitz development:

"The securing of an Iowa state permit is not in any sense a condition precedent or an administrative procedure that must be exhausted before securing a federal license. It is a

procedure required by the State of Iowa in dealing with its local streams and also with the waters of the United States within that State in the absence of an assumption of jurisdiction by the United States over the navigability of its waters. Now that the Federal Government has taken jurisdiction of such waters under the Federal Power Act, it has not by statute or regulation added the state requirements to its federal requirements. . . .

"The Act leaves to the States their traditional jurisdiction subject to the admittedly superior right of the Federal Government, through Congress, to regulate interstate and foreign commerce, administer the public lands and reservations of the United States and, in certain cases, exercise authority under the treaties of the United States. These sources of constitutional authority are all applied in the Federal Power Act to the development of the navigable waters of the United States.

"The closeness of the relationship of the Federal Government to these projects and its obvious concern in maintaining control over their engineering, economic and financial soundness is emphasized by such provisions as those of § 14 authorizing the Federal Government, at the expiration of a license, to take over the licensed project by payment of 'the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken,' plus an allowance for severance damages. The scope of the whole program has been further aided, in 1940, by the definition given to navigable waters of the United States in *United States v. Appalachian Power Co.,* 311 U. S. 377. 'Students of our legal evolution know how this Court interpreted the commerce clause of the Constitution to lift navigable waters of the United States out of local controls and into the domain of federal control. *Gibbons v. Ogden,* 9 Wheat. 1, to *United States v. Appalachian Power Co.,* 311 U. S. 377.' *Northwest Airlines v. Minnesota,* 322 U. S. 292, 303. . . .

"As indicated by Representative LaFollette, Congress was concerned with overcoming the danger of divided authority so as to bring about the needed development of water power and also with the recognition of the constitutional rights of the States so as to sustain the validity of the Act. The resulting integration of the respective jurisdictions of the State and Federal Governments is illustrated by the careful preservation of the separate interests of the States throughout the Act, without setting up a divided authority over any one subject.

"Sections 27 and 9 are especially significant in this regard. Section 27 expressly 'saves' certain state laws relating to property rights as to the use of water, so that these are not superseded by the terms of the Federal Power Act. It provides:

" 'Sec. 27. That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.' 41 Stat. 1077, 16 U. S. C. § 821.

"Section 27 thus evidences the recognition by Congress of the need for an express 'saving' clause in the Federal Power Act if the usual rules of supersedure are to be overcome. Sections 27 and 9 (b) were both included in the original Federal Water Power Act of 1920 in their present form. The directness and clarity of § 27 as a 'saving' clause and its location near the end of the Act emphasizes the distinction between its purpose and that of § 9 (b) which is included in § 9, in the early part of the Act, which deals with the marshalling of information for the consideration of a new federal license. In view of the use by Congress of such an adequate 'saving' clause in § 27, its failure to use similar language in § 9 (b) is persuasive that § 9 (b) should not be given the same effect as is given to § 27.

"The effect of § 27, in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase 'any vested right acquired therein' further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope unless it be the words 'other uses.' Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes. This was so held in an early decision by a District Court, relating to § 27 and upholding the constitutionality of the Act, where it was stated that 'a proper construction of the act requires that the words "other uses" shall be construed ejusdem generis with the words "irrigation" and "municipal." ' *Alabama Power Co. v. Gulf Power Co.*, 283 F. 606, 619.

"This section therefore is thoroughly consistent with the integration rather than the duplication of federal and state

jurisdictions under the Federal Power Act. It strengthens the argument that, in those fields where rights are not thus 'saved' to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course."

■■ The Federal power act, as construed in the *Appalachian Electric* case, *supra*, and the *First Iowa* case, is the supreme law of the land and, under the supremacy clause (Art. VI, U. S. constitution), is binding upon this court. On the authority of those decisions, we must hold that Congress had the constitutional power to enact the Federal power act and that, in doing so, it intended to exercise its full jurisdiction to authorize the power commission to supersede state laws purporting to prohibit or limit the construction of dams on navigable streams. By passing the act, Congress pre-empted the entire field and authorized the power commission to issue licenses for such construction upon such conditions as it deemed proper.

After the decision of the supreme court in the *First Iowa* case, *supra*, the matter was remanded to the Federal power commission, which thereafter granted the license applied for. This action was reviewed by the circuit court of appeals for the eighth circuit in *Iowa v. Federal Power Commission*, 178 F. (2d) 421. In that case, the state contended, *inter alia*, that the issuance of the license was invalid because the power commission had failed to give adquate consideration to the effect of the project on wildlife resources as required by the act of Congress of August 14, 1946. One of the conditions of the license was that:

" 'The licensee shall construct, maintain and operate such fish protective devices and shall comply with such reasonable conditions in the interest of fish life as may be hereafter prescribed upon the recommendation of the Secretary of the Interior.' "

The court denied the state's petition to set aside the power commission's order granting the license, saying as to the state's contention:

"The Commission in its brief points out that, in the hearings held prior to the enactment of the Act of August 14,

1946, the Iowa Conservation Commission, as intervener, appeared and produced evidence 'with regard to fish life in the area and the probable effect of the project thereon.' Apparently, the views of the State Conservation Commission were received and considered by the Federal Power Commission. Moreover, under the terms of the license, the applicant may still be required to do whatever may be reasonable for the protection of fish life. The defects, if any, in the Commission's proceedings relative to the protection of wildlife resources could not, in our opinion, be regarded as sufficiently vital or prejudicial to justify a vacation of the orders under review."

While it has no bearing upon the issues in this case, it may be of interest to those concerned about the preservation of anadromous fish life on the upper Cowlitz river that the power commission, as it did in the case of *Iowa v. Federal Power Commission, supra,* has placed in appellant's license conditions dealing with protection of fish life. These conditions read:

"*Article 30.* Before beginning the construction of any permanent fish ladders, fish traps or other fish handling facilities, or fish protective devices, the Licensee shall make further studies, tests and experiments to determine the probable effectiveness of such facilities and devices and shall submit plans therefor and obtain Commission approval. In making such studies, tests and experiments and in the preparation of final design plans, the Licensee shall cooperate with the United States Fish and Wildlife Service and the Departments of Fisheries and Game of the State of Washington. The Licensee shall continue its studies and investigations with respect to its proposed program of stream improvement and hatchery facilities. The Licensee shall submit quarterly reports to the Commission of its activities hereunder."

"*Article 31.* The Licensee shall construct, maintain and operate such fish ladders, fish traps or other fish handling facilities or fish protective devices and make such stream improvements and provide such fish hatcheries and similar facilities and comply with such reasonable modifications of the project structures and operation in the interest of fish as may be prescribed hereafter by the Commission upon its own motion or upon the recommendation of the Secretary of the Interior."

Furthermore, Congress since 1946 has required the Federal power commission to

" . . . consult with the Fish and Wildlife Service and the head of the agency exercising administration over the wildlife resources of the State wherein the impoundment, diversion, or other control facility is to be constructed with a view to preventing loss of and damage to wildlife resources. . . ." (60 Stat. 1080, 16 U. S. C. A. (Sup.) § 662)

It is vigorously asserted by respondents and cross-appellants that appellant, being a municipal corporation created by the state, may not defy the laws of its creator. In other words, assuming that appellant ever had the power to construct dams on rivers resulting in the destruction of fish life, it is contended that the legislature has taken that right away with respect to the Cowlitz river by enacting the fish sanctuary act (Chap. 9, Laws of 1949).

The legislature must be presumed to have known when enacting that law that, for at least forty years, all classes of municipal corporations had been authorized by it to operate certain public utilities. *Hutton v. Martin,* 41 Wn. (2d) 780, 252 P. (2d) 581. As last amended in 1947, the pertinent statute (Rem. Supp. 1947, § 9488 [*cf.* RCW 80.40.050]) included power to:

"Construct, condemn and purchase, purchase, acquire, add to, maintain and operate works, plants and facilities for the purpose of furnishing such city or town and the inhabitants thereof, and any other persons, with gas, electricity and other means of power and facilities for lighting, heating, fuel and power purposes. . . ."

In *Tacoma v. Nisqually Power Co.,* 57 Wash. 420, 107 Pac. 199, appellant was seeking to condemn property for power purposes upon a petition alleging:

" 'That at all times since the year 1893 the city of Tacoma has been engaged in the business of owning, operating and maintaining works, plants and facilities for the purpose of furnishing said city and the inhabitants thereof with electricity and facilities for lighting, heating, fuel and power purposes, public and private.' "

This would seem to indicate that appellant for about sixty

years has been engaged in the business of producing and selling electric power.

In *Tacoma v. State*, 121 Wash. 448, 209 Pac. 700, appellant was permitted to condemn state land for the purpose of constructing a dam as part of a hydroelectric project. The state contended that the city's diversion of the water of a certain stream would destroy or damage the propagation of food fish. After referring to the "broad powers conferred upon cities by our statute, Rem. Comp. Stat., § 9488," this court answered the state's objection to this condemnation of its rights as follows:

"The contention that the diversion of the waters will destroy or seriously damage the propagation of food fish, we cannot find to be sustained by a preponderance of the evidence. But even if it were, we would be reluctant to hold that the fish, by following their natural instincts, had devoted the stream to such a public purpose as would defeat the city's rights under the statutes hereinbefore cited."

The passage of chapter 9, Laws of 1949, does not purport to amend or repeal Rem. Supp. 1947, § 9488. No reference whatever is made therein to municipal corporations or their right to engage in the production and sale of electric energy. It cannot be viewed as a repeal of this statute by implication.

■ Conceding that the legislature has the power to curtail or abolish appellant's present authority to engage in the electric utility business, we are convinced that it has not as yet exercised such power.

■ The Federal power act defines the term municipal corporation and authorizes the power commission to issue a license to such an entity. Appellant has complied with the state law with respect to the right of a municipality to engage in the business of developing, transmitting and distributing power. Having been granted a license by the power commission, we hold that appellant is at the present time in the same position as any other licensee under the act. See *State ex rel. Washington Water Power Co. v. Superior Court*, 34 Wn. (2d) 196, 208 P. (2d) 849.

The further contention is made that a municipal corporation has no rights which are protected by the United

States constitution. In support of this position, several cases are cited relating to the fourteenth amendment, which, in substance, guarantees to "any person" due process and equal protection of the laws, and cases relating to Art. I, § 10, prohibiting the impairment of contracts. See 116 A. L. R. 1037.

This contention is without merit because in the present case the right of appellant to proceed with the construction of this project is based on the Federal power act, which, in turn, is based on the commerce clause of the Federal constitution. Fundamentally, it is the United States whose power to regulate commerce on navigable streams is primarily being questioned in this suit. Appellant's rights under its license from the power commission are governed by the Federal power act and have no relation to the fourteenth amendment nor to Art. I, § 10, of the Federal constitution.

Since we have found that the two state laws involved in this case *to the extent that they are in conflict with* the Federal power act are inoperative, we do not deem it necessary to pass upon appellant's other contentions that these laws violate certain provisions of the state constitution and are invalid *in toto.*

Paraphrasing the language of the supreme court in concluding its opinion in the *First Iowa* case, *supra,* we hold that:

It is the Federal power commission rather than the director of fisheries and the director of game of the state of Washington which under our constitutional government must pass upon the measures necessary for the protection of anadromous fish in the navigable streams in this state on behalf of the people of Washington as well as on behalf of all the people of the United States.

Without further extending this opinion, we deem it sufficient to state that, for the several reasons above set forth, we are of the opinion that appellant's complaint states a cause of action, and that, on the basis of the facts alleged therein, appellant has a valid license issued by the power commission for the construction of the Cowlitz power devel-

opment and that the utility bonds authorized by ordinance No. 14386 have not been shown to be invalid in any respect.

On appellant's appeal, the judgment dismissing its complaint is reversed, with instructions to overrule the demurrer thereto and to proceed further in this case consistently with the views expressed herein.

■ With respect to the cross-appeal, the trial court's order dismissing appellant's complaint recited that it was not necessary "to rule or pass upon plaintiff's demurrer to said cross-complaint." Since the trial court did not pass upon that question or enter any final order regarding that issue, there is nothing for this court to review on the cross-appeal. Accordingly, it must be, and hereby is, dismissed.

MALLERY, SCHWELLENBACH, FINLEY, WEAVER, and OLSON, JJ., concur.

HAMLEY, J. (dissenting)—In my opinion, the enactment of Laws of 1949, chapter 9, p. 38 [cf. RCW 75.20.010, .020, .030], represents the exertion of two distinct powers of state government—the police power of the state to preserve its fishing resources, and the power to define and control the functioning of subordinate units of government.

In so far as chapter 9 is sought to be applied as an exercise of police power, it may or may not have been superseded by the Federal power act, a question we need not now decide. In so far as chapter 9 is sought to be applied as an exercise of the power of the state over subordinate units of government, it has not been superseded. The Federal government may not confer corporate powers upon local units of government, and the Federal power act does not purport to do so. The supersedure, if any, with respect to the exertion of police power, does not affect applicability of chapter 9 as an exercise of the other power named, for, in my view, the legislature would have intended the act to remain in force in the latter regard had the matter of supersedure been called to its attention.

That the legislature may restrict the powers of municipalities, is beyond question. Cities are limited governmental arms of the state. *Russell v. Grandview*, 39 Wn.

(2d) 551, 236 P. (2d) 1061. They may exercise only those powers which are granted to them in the state constitution or statutes. Except as limited by the constitution, legislative control over municipalities is therefore plenary. *State v. Aberdeen,* 34 Wash. 61, 74 Pac. 1022; *Wheeler School Dist. v. Hawley,* 18 Wn. (2d) 37, 137 P. (2d) 1010. It follows that the legislature may enlarge or diminish powers already granted to such subordinate units of government. *State ex rel. Nat. Bank of Tacoma v. Tacoma,* 97 Wash. 190, 166 Pac. 66. Needless to say, the wisdom of any restriction which the legislature determines to place upon the corporate powers of municipalities is not an issue in this court.

That the legislature intended Laws of 1949, chapter 9, to restrict the corporate powers of municipalities with regard to the construction of the dams in question, seems clear to me. Under Rem. Supp. 1947, § 9488 [*cf.* RCW 80.40-.010 *et seq.*], incorporated cities or towns are authorized and empowered to erect and build dams or other works across or at the outlet "of any lake or water course in this state." If that corporate power were left undisturbed, the whole purpose of the fish sanctuary act would be defeated. Hence, when, in chapter 9, the legislature forbade the construction of any dam of a height greater than twenty-five feet on "all streams and rivers tributary to the Columbia River downstream from McNary Dam," it by implication amended or partially repealed Rem. Supp. 1947, § 9488, so as to restrict, to that extent, the corporate powers granted by the latter statute.

I recognize that repeals of statutes by implication are not favored, and to so work a repeal the implication must be a necessary one. *Mesher v. Osborne,* 75 Wash. 439, 134 Pac. 1092; *Generaux v. Petit,* 172 Wash. 132, 19 P. (2d) 911. But, where the subsequent legislation is contrary to, and inconsistent with, a former act, a repeal by implication is effected. *Peterson v. King County,* 199 Wash. 106, 90 P. (2d) 729. Here the conflict between Rem. Supp. 1947, § 9488, permitting municipal corporations to construct dams for stated purposes across or at the outlet of "any lake or water course in this state," and Laws of 1949, chapter 9,

forbidding the construction of dams of a greater height than twenty-five feet on certain water courses, is patent—they cannot both stand.

Appellant argues that the provisions of chapter 9 are not separable, and that if that chapter is superseded to any extent, it is thereby rendered wholly void.

The question here is not whether part of the statute is enforcible where the remainder has been declared invalid (as in all cases cited by appellant), but whether all of the act is enforcible as to incorporated municipalities if it is found to be unenforcible and void as to other persons and corporations.

The doctrine of separability has most frequently been applied to statutes of which one or more sections were valid and other sections, relating to other subjects, were unconstitutional. However, the rule is not limited to such instances, and when, as here, the same provision of the statute affects different classes of persons or corporations, as to some of which it is valid, and as to others of which it may be invalid, the valid applications of the statute may be held enforcible. *State v. Bevins*, 210 Iowa 1031, 230 N. W. 865; *Robert Dollar Co. v. Canadian Car & Foundry Co.*, 220 N. Y. 270, 115 N. E. 711. In the latter case, no question as to the workability of part of a statute is presented, but there does remain the question of whether the legislature would have passed the statute knowing that it would have only its limited application. *Robert Dollar Co. v. Canadian Car & Foundry Co., supra; State v. Bevins, supra.* For a discussion of the difference between these two kinds of separability problems, see 2 Sutherland Statutory Construction (3d ed.) 175, 190-194, §§ 2402, 2413-2416.

In my view, the legislative history of chapter 9 indicates that the legislature would have restricted the corporate powers of municipalities in the respect indicated, even had it then believed that, as to persons and corporations other than incorporated municipalities, the state could not prohibit the building of such structures.

Chapter 9 was introduced as S. B. 4. After it had passed the Senate and when it was on second reading in the House,

Representative William D. Shannon moved the adoption of an amendment which would have excluded from the operation of the act "the waters of the Cowlitz River lying East of Range 1 East of the Willamette Meridian." House Journal, page 215. During the debate which then ensued on this amendment, the following colloquy occurred:

"Mr. Carty: 'Mr. Speaker, I would like to ask Mr. Shannon a question.' The Speaker: 'Will the gentleman yield?' Mr. Shannon: 'Yes.' Mr. Carty: 'Just what area of this proposed dam would this line drawn in your amendment cross?' Mr. Shannon: 'A mile and a half below the Mayfield Dam.' Mr. Carty: 'Then the purpose of this amendment would be to make this act ineffective?' Mr. Shannon: 'In my opinion, it wouldn't. It would make a fish sanctuary on all of the lower part of the Cowlitz River; on all the tributaries below the Mayfield Dam, about twenty miles from the Columbia River up.' "

As indicated in the majority opinion, the Mayfield dam is one of the two projects here in question, the other being further upstream on the same river. The purpose of Mr. Shannon's amendment, therefore, was to exclude from the act that portion of the Cowlitz river on which these two dams are sought to be constructed. After this information was disclosed during the exchange quoted above, Mr. Shannon's amendment was laid on the table and the bill was passed in its present form.

It therefore appears that the prime purpose of chapter 9 was to forestall construction of the very dams involved in this case. Nothing in the act, nor in its legislative history, indicates that the legislature intended to give ground any more than it was compelled to in enforcing the stated policy of protecting anadromous fish life in the rivers and streams tributary to the lower Columbia river. While the construction of high dams by any person or corporation would defeat that purpose, the plan of appellant city to construct the dams in question offered the real threat.

Appellant also argues that chapter 9 was enacted in violation of the Washington constitution, Art. II, § 19, pertaining to the subjects to be embraced in a bill, and the form

of title; and in violation of Art. II, § 1, which vests legislative power in the Senate and House of Representatives. In my opinion, these contentions are without merit, but no useful purpose will be served by discussing them in this dissenting opinion.

I would affirm the judgment.

HILL, J. (dissenting)—I concur in Judge Hamley's dissent. I am of the opinion, also, that a *license* from the Federal government does not give the licensee the right to disregard *legislation enacted by the state of Washington in the exercise of its police power.*

GRADY, C. J., concurs with HAMLEY and HILL, JJ.

December 14, 1953. Petition for rehearing denied.

