[Nos. 44401, 46342. En Banc. November 30, 1979.]

PUGET SOUND GILLNETTERS ASSOCIATION, ET AL, *Petitioners,* v. DONALD MOOS, ET AL, *Respondents.*

WASHINGTON STATE COMMERCIAL PASSENGER FISHING VESSEL ASSOCIATION, *Respondent,* v. THOR TOLLEFSON, ET AL, *Appellants.*

WASHINGTON KELPERS ASSOCIATION, *Respondent,* v. THOR TOLLEFSON, ET AL, *Appellants.*

940

*Charles E. Yates* and *Moriarty, Mikkelborg, Broz, Wells & Fryer,* for Puget Sound Gillnetters, et al.

*Slade Gorton, Attorney General, Edward B. Mackie, Deputy,* and *James M. Johnson, Senior Assistant,* for Department of Fisheries.

HOROWITZ, J.—The cases of *Puget Sound Gillnetters Ass'n v. Moos,* 88 Wn.2d 677, 565 P.2d 1151 (1977) (*Gillnetters*) and *Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson,* 89 Wn.2d 276, 571 P.2d 1373 (1977) (*Commercial Passenger*) return to this court through vacation of the judgments rendered by this court

in those causes and remand by the Supreme Court of the United States. The mandate from that court directs us to proceed in a manner "not inconsistent with the opinion" of the United States Supreme Court in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979) (*Fishing Vessel*). In conjunction with our reconsideration on remand, the defendants in these cases, the State and the Director of the Department of Fisheries, have made a motion for modification of our earlier ·decisions, requesting an order. affirming that the State "has the authority in managing the anadromous fish resource to do so in a manner which recognizes and gives full force and effect to the Indian treaty fishing rights as defined by the United States Supreme Court and subsequent allocation orders to be entered by the United States District Court for Western Washington pursuant to the remand instructions of the United States Supreme Court." The Puget Sound Gillnetters Association opposes the motion of the State and Director of Fisheries for modification.

We comply with the United States Supreme Court's mandate and issue the order sought by the State in our opinion today. This removes obstacles to reassumption by the State of management of anadromous fish resources. In order to understand the nature and significance of the mandate and motion, a review of the facts leading up to this opinion is appropriate.

## I

In 1854 and 1855 the United States and several Indian tribes in the western portion of what was to become the state of Washington entered into treaties that guaranteed to the Indian tribes the "right of taking fish at usual and accustomed grounds and stations . . . in common with all citizens of the Territory."[1] The treaties and the Indians' rights to anadromous fish under the treaties lay largely

---

[1]This is the language of the Treaty with the Nisqually &c. Other Indian Tribes, art. III, Dec. 26, 1854, 10 Stat. 1132, 1133 (Treaty of Medicine Creek).

unexamined for over a century. *See State ex rel. Campbell v. Case,* 182 Wash. 334, 340–41, 47 P.2d 24 (1935).

Beginning in the late 1960's, the treaties and the rights guaranteed by them were the subject of litigation in both state and federal courts. Inconsistent interpretations of the treaty provisions developed in the two court systems, necessitating the United States Supreme Court's review of the subject area in *Fishing Vessel.* A brief review of the federal and state cases affected by the Supreme Court's decision will define the nature of this court's function on remand of that case.[2]

The District Court for the Western District of Washington, in a case brought against the State of Washington by the United States, independently and as trustee for several Indian tribes, first ruled that the treaty tribes were entitled to up to 50 percent of the harvestable fish passing through their "usual and accustomed" off–reservation fishing sites, exclusive of fish caught on reservation lands and fish taken for ceremonial and sustenance purposes. *United States v. Washington,* 384 F. Supp. 312, 343 (W.D. Wash. 1974).[3]

---

Virtually identical language was used in the other relevant treaties, and the treaties have traditionally been construed together. Treaty with the Dwamish and Other Indian Tribes, Jan. 22, 1855, 12 Stat. 927 (Treaty of Point Elliott); Treaty with the S'klallams and Other Indian Tribes, Jan. 28, 1855, 12 Stat. 933 (Treaty of Point No Point); Treaty with the Makah Tribe, Jan. 31, 1855, 12 Stat. 939 (Treaty of Neah Bay); Treaty with the YaKama and Other Indian Tribes, June 9, 1855, 12 Stat. 951 (Treaty of Camp Stevens); Treaty with Quinaielt and Other Indian Tribes, July 1, 1855, 12 Stat. 971 (Treaty of Quinault River).

[2]Not considered in this review are three unreported cases in which the United States Supreme Court granted certiorari on the same day it decided *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, supra.* The judgments in *Harrington v. United States, Dolman v. United States* and *Minnich v. United States* were vacated and the cases were remanded to the Ninth Circuit for further consideration in light of the Supreme Court's decision in *Fishing Vessel.* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979).

[3]*United States v. Washington, supra,* concerned the anadromous fish runs of a portion of the state which Judge Boldt referred to as the "case area":
> The case area is that portion of the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area, and includes the American portion of the Puget Sound watershed, and watersheds of the

The court ordered the State Departments of Fisheries and Game to adopt and enforce regulations consistent with its interpretation of the treaties. *United States v. Washington, supra* at 420. The Court of Appeals affirmed that decision, with minor revisions, 520 F.2d 676, 693 (9th Cir. 1975); the Supreme Court denied certiorari, 423 U.S. 1086, 47 L. Ed. 2d 97, 96 S. Ct. 877 (1976).

The Fisheries' regulations promulgated pursuant to the federal courts' decision were the subject of cases brought in state courts against the State by nontreaty fishermen. This court heard two of those cases especially pertinent here. In *Gillnetters* this court ruled that the Department of Fisheries authority to regulate commercial salmon fishing extended only to regulations for conservation purposes, and that allocation as contemplated by the District Court's order would constitute a violation of equal protection and provide Indian fishermen with unconstitutional special privileges and immunities. *Puget Sound Gillnetters Ass'n v. Moos, supra* at 684, 692. *See also Purse Seine Vessel Owners Ass'n v. Moos*, 88 Wn.2d 799, 567 P.2d 205 (1977). This court further held that the federal district court did not have the power to order the state agency to act in excess of its statutory authority. *Gillnetters, supra* at 689.

This court's decision in *Commercial Passenger* further explained the court's position that interpretation of the treaties to guarantee the Indian tribes a share of the anadromous fish runs would violate equal protection and that the district court could not order a state agency to allocate in an unconstitutional manner. *Commercial Passenger, supra* at 285. This court had earlier interpreted the Medicine Creek Treaty to provide individual Indians, not the tribes themselves, with only an equal opportunity to fish at

Olympic Peninsula north of the Grays Harbor watershed, and the off–shore waters adjacent to those areas.

*United States v. Washington*, 384 F. Supp. 312, 328 (W.D. Wash. 1974). The district court's case area was later expanded to include the Grays Harbor area. *Puget Sound Gillnetters Ass'n v. United States Dist. Ct.*, 573 F.2d 1123, 1130–31 (9th Cir. 1978).

"usual and accustomed" sites. *Department of Game v. Puyallup Tribe, Inc.,* 86 Wn.2d 664, 548 P.2d 1058 (1976) (*Puyallup* III).

With state agency regulation precluded by this court's interpretation of the extent of the agency power and the nature of the allocation required by the federal courts' decision, the District Court, through a series of orders, undertook direct supervision of the relevant fisheries. *E.g.,* Memorandum Order and Preliminary Injunction (Aug. 10, 1977); Memorandum Order and Preliminary Injunction (Aug. 31, 1977); Temporary Restraining Order (Oct. 8, 1977); Preliminary Injunction (Oct. 17, 1977). The Court of Appeals affirmed these actions in *Puget Sound Gillnetters Ass'n v. United States Dist. Ct.,* 573 F.2d 1123 (9th Cir. 1978).

*Gillnetters, Commercial Passenger,* and two Court of Appeals decisions considering *United States v. Washington, supra,* were reviewed by the Supreme Court of the United States on writ of certiorari in *Fishing Vessel.*[4] The United States Supreme Court in that opinion ruled that the treaty tribes have a right to harvest up to 50 percent of anadromous fish runs passing through their "usual and accustomed" fishing sites, inclusive of on–reservation, subsistence, and ceremonial Indian catches, that such a treaty right does not violate equal protection principles, and that the State Departments of Fisheries and Game can be ordered by the federal courts to adopt and enforce regulations insuring these treaty rights even if prohibited that power by state law. Partial federal management of the fishery continues until December 1, 1979, through a partial stay of the United States Supreme Court's judgment.

---

[4]The Supreme Court granted certiorari in the Ninth Circuit cases of *Puget Sound Gillnetters Ass'n v. United States Dist. Ct.,* 573 F.2d 1123 (9th Cir. 1978) and *United States v. Washington,* 573 F.2d 1118 (9th Cir. 1978), both of which considered the enforcement aspects of Judge Boldt's decision in *United States v. Washington,* 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd,* 520 F.2d 676 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086, 47 L. Ed. 2d 97, 96 S. Ct. 877 (1976).

Order, *Fishing Vessel* (July 31, 1979) (Supreme Court per Stevens, J.).

It is hoped that the United States Supreme Court's decision provides a juristic solution to a problem that has divided the citizens of this state since the inception of these suits. It is further hoped that our response to the United States Supreme Court's mandate will allow the State to reassume direct management of the State's fisheries in a manner which acknowledges and provides for Indian treaty fishing rights, in accordance with the State's request.

## II

■ This court has consistently held that the State Departments of Fisheries and Game can regulate for "conservation only." *Gillnetters, supra* at 681 (Department of Fisheries); *Hartman v. State Game Comm'n,* 85 Wn.2d 176, 532 P.2d 614 (1975) (Department of Game). However, the power to manage a fishery for conservation purposes only is not a restrictive one; it enables the agency to collect data regarding the size, placement, and harvest of runs, to regulate the type of gear and times at which it can be employed in fishing specific varieties and runs of fish, to discriminate among classes of users by gear and purpose, to artificially enhance the fishery through hatchery programs, and even to force the owners of existing dams to improve fish passage facilities. *See Department of Fisheries v. Chelan County PUD 1,* 91 Wn.2d 378, 588 P.2d 1146 (1979); *Washington Kelpers Ass'n v. State,* 81 Wn.2d 410, 502 P.2d 1170 (1972); *Frach v. Schoettler,* 46 Wn.2d 281, 280 P.2d 1038 (1955); *McMillan v. Sims,* 132 Wash. 265, 231 P. 943 (1925); *Vail v. Seaborg,* 120 Wash. 126, 207 P. 15 (1922). It has in the past included the power to exclude from state regulation Indians fishing "under federal regulation." *State ex rel. Campbell v. Case, supra* at 340–41.

Salmon have been allocated among fishermen using different types of gear ever since it became necessary to manage the resource. We do not agree for the reasons stated below with the assertion of the Puget Sound Gillnetters

Association in its brief in opposition to the motion of the State and the Director of Fisheries, that the Department of Fisheries has no statutory authority to participate in allocation. The gillnetters, and their fellow reefnetters, purse seiners and salmon trollers, have all benefited from department regulations limiting the fishing of other user groups to insure each class of fishermen a "share" of the State's salmon resources. *See Gillnetters, supra* at 683. Limiting an agency to conservation regulation has consistently had only one real effect—it prevents the agency from allocating fish among "competing claimants for purposes other than conservation," *Gillnetters, supra* at 683, *i.e.,* "to any user of the same class." *Gillnetters, supra* at 692; *see also Kelpers, supra* at 421–22.

In every case in which this court has found a fishing regulation to be for a nonconservation purpose, striking down the regulation prevented what this court perceived as a violation of equal protection. *Gillnetters, supra, Purse Seine, supra, Commercial Passenger, supra, State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P.2d 1101 (1936). *See also McMillan v. Sims,* 129 Wash. 516, 225 P. 240 (1924), *rev'd on rehearing,* 132 Wash. 265, 231 P. 943 (1925). Under this court's earlier analysis, interpretation of the Indian treaties in a manner requiring allocation of fish to treaty fishermen would violate equal protection. In *Gillnetters,* this court held that the Director of Fisheries could not "allocate fish to any user of the same class, [and] that every fisherman in a class must be treated equally . . ." *Gillnetters, supra* at 692.

■■ However, the United States Supreme Court reiterated in *Fishing Vessel* the "peculiar semi–sovereign and constitutionally recognized status of Indians" and established the constitutional validity of allocation of a portion of fish runs to treaty fishermen—*i.e.,* they constitute a "permissible class." To resurrect a principle that has in the past justified Fisheries' classifications, nontreaty fishermen do not have a "vested" or "natural" property *right* to fish,

to take fish, or to fish–taking locations.[5] 443 U.S. at 684, 99 S. Ct. at 3074, *Campbell, supra; McMillan, supra; Vail, supra; State v. Tice,* 69 Wash. 403, 125 P. 168 (1912). The United States Supreme Court has clearly ruled, however, that the Indian treaties of the 1850's reserve to the signatory tribes a right to fish that nontreaty fishermen do not enjoy. 443 U.S. at 681, 99 S. Ct. at 3072.

Thus, treaty and nontreaty fishermen can no longer be considered "competing claimants" among whom allocation is impermissible under *Gillnetters.* We must overrule any holdings in our earlier decisions that Indian fishing rights or their implementation constitute a violation of equal protection, including especially *Gillnetters, supra* at 684; *Purse Seine, supra* at 810–11; *Commercial Passenger, supra* at 281, 285.

■ Since the treaties guarantee signatory tribes a share of the anadromous fish runs, establishing their fishermen as part of a valid separate class, and because conservation requires some limitation on the type and numbers of fish caught, allocation among treaty and nontreaty user classes is necessary to insure preservation of the resource and can be justified under our regulatory scheme "as part of the comprehensive conservation and management program carried on by the state." *Kelpers, supra* at 418.

This interpretation is consistent with the federal courts' rulings on the extent of state control over treaty fishermen. While ordering state agencies to allocate fish among treaty and nontreaty user groups, the district court ruled that the State could regulate treaty tribe fishing only if "both reasonable and necessary to preserve and maintain the

---

[5]Until the Indian treaty fishing rights cases arose, fishermen objecting to agency regulation had for almost half a century seemingly abandoned the argument that fishing limitations constitute a taking of property. As discussed later in this opinion, the State may be thought to "own" fish for regulatory purposes; the individual nontreaty fisherman has no property rights that guarantee him a share of the runs that could be held inviolate from treaty fishing rights. The property rights theory, discredited since the time of Blackstone, was last seriously raised before this court in the 1920's. *See McMillan v. Sims,* 132 Wash. 265, 231 P. 943 (1925); *Vail v. Seaborg,* 120 Wash. 126, 207 P. 15 (1922).

resource." *United States v. Washington,* 384 F. Supp. 312, 402, *aff'd,* 443 U.S. at 682, 99 S. Ct. at 3073. The United States Supreme Court accepted the State's view, expressed in argument before that court, that conservation purposes can justify allocation among different classes. 443 U.S. at 693 n.34, 99 S. Ct. at 3079.

We therefore hold that, in light of the Supreme Court's interpretation of the nature of Indian treaty fishing rights, allocation among treaty and nontreaty fishermen user classes is necessary to prevent depletion of the resource and to reestablish and "maintain the economic well–being and stability of the commercial fishing industry in the state of Washington." RCW 75.08.012. Regulations necessary to manage the fishery in a manner consistent with implementation of tribal treaty rights can be promulgated by the State of Washington.

Regulations implementing treaty fishing rights therefore can be enforced under state law. RCW 75.08.260 provides that "any person who violates any of the provisions of the fisheries code, or any of the rules or regulations of the director made pursuant thereto . . . shall be guilty of a gross misdemeanor . . ."; RCW 75.08.270 gives justices of the peace and superior courts concurrent jurisdiction over violations "of the fisheries code and of the rules, regulations, and orders made by the director in accordance with existing law," and gives these courts the power "to impose any penalty or confiscation provided for such offenses."

The Attorney General assured the United States Supreme Court that state enforcement of its interpretation of treaty rights would be possible after "definitive resolution of the basic federal question of construction of the treaties" and that there would be no "need for the District Court to continue its own direct supervision of enforcement efforts." 443 U.S. at 693–94, 99 S. Ct. at 3078–79. No doubt these representations were made in good faith; they contain no suggestion that the State would decline to enforce regulations implementing treaty rights. All allocative regulations implementing Indian treaty rights are to be fully

enforced by state officials; the courts of this state are always available for that purpose.

In addition, we note that this court in *Puyallup* III acknowledged the Game Department's ability to allocate steelhead in accommodation of Indian treaty rights. *Puyallup* III, *supra* at 686–87. The Attorney General told this court in oral argument that both state agencies would feel bound by our decision that allocation can be undertaken for conservation purposes. We simply note here that the foregoing analysis supports allocation of steelhead between treaty and sports fishermen by the Department of Game and that regulation and enforcement should be undertaken by that agency in light of this interpretation. *See generally* RCW 77.04.080, 77.12.040, 77.12.070, 77.16.240.

## III

■ We next modify our decisions that the federal courts cannot compel a state agency to act beyond statutory authority to conform with the United States Supreme Court's ruling that such an order is enforceable. Although, as noted by the United States Supreme Court, 443 U.S. at 694, 99 S. Ct. at 3078–79, the federal courts' power to order a state agency to act in excess of its statutory authority is of no consequence if regulation and enforcement is undertaken by the state under the analysis adopted by us in section II of this opinion, we wish to make clear the power of the district court to order the state agencies to manage the fishery, or to manage the fishery itself, in a manner consistent with the United States Supreme Court's interpretation of Indian treaty rights should appropriate state–law based management not be forthcoming from the agencies. "State–law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution . . . Game and Fisheries, as parties to this litigation, may be ordered to prepare a set of rules that will implement the Court's interpretation of the rights of the parties even if state law

withholds from them the power to do so." 443 U.S. at 695, 99 S. Ct. at 3079. (Citations omitted.) *See also Tacoma v. Taxpayers,* 43 Wn.2d 468, 262 P.2d 214 (1953), *rev'g but aff'g* supremacy clause principle, 357 U.S. 320, 2 L. Ed. 2d 1345, 78 S. Ct. 1209 (1958).

The treaty rights of the signatory tribes create a federal obligation that cannot be adversely affected by state law. *See Antoine v. Washington,* 420 U.S. 194, 43 L. Ed. 2d 129, 95 S. Ct. 944 (1975). The supremacy clause requires that the state agencies comply with orders necessary to implement the Supreme Court's interpretation of the rights guaranteed by treaty. We must overrule any contrary holdings, including *Gillnetters, supra* at 689 and *Purse Seine, supra* at 810.

We wish to point out here the obvious correlative impact of the supremacy clause on state legislation. Any attempt to limit by statute or administrative regulation the effect of the treaties on the state fisheries cannot survive the superior force of federal law protecting the signatory tribes' right to anadromous fish resource. The Puget Sound Gillnetters Association's contention that this court should await definition by the state legislature of the nature and extent of the state's involvement in implementation of Indian treaty fishing rights while the federal district court retains management of the state's anadromous fish resources must be rejected. Since the state's statutory scheme now allows the department to undertake management of the state's fisheries in a manner consistent with the United States Supreme Court's interpretation of Indian treaty rights we see no reason to preclude the State from reassuming such management power. The supremacy clause effectively prohibits abrogation of state law which facilitates implementation of a protected right just as it effectively demands abrogation of a state law which would otherwise prevent enforcement of the right.

In addition, as parties to the federal litigation, the Departments of Game and Fisheries could be ordered to promulgate and enforce implementing rules even if state

law limiting fishery management to conservation purposes did withhold allocative power. 443 U.S. at 695, 99 S. Ct. at 3079. We hold that the agencies made party to the federal litigation are bound by the United States Supreme Court's interpretation of Indian treaty rights and are obligated, as parties and under the supremacy clause, to comply with orders necessary to implement the United States Supreme Court's decision regarding the nature of treaty obligations. Recourse from erroneous federal court decisions is through the federal court system.

## IV

We also reassert and emphasize the United States Supreme Court's holding that nonparties to the federal litigation, such as plaintiff fishing groups in these remanded cases, are bound by the United States Supreme Court's treaty interpretations. The Ninth Circuit upheld district court injunctions against nonparties in *Puget Sound Gillnetters Ass'n v. United States Dist. Ct.,* 573 F.2d 1123 (9th Cir. 1978), because the individuals and associations enjoined were in "privity" with the state, a party which owns, for regulatory purposes, the fishery resources at issue. *Puget Sound Gillnetters Ass'n v. United States Dist. Ct., supra* at 1132, citing *Washington Kelpers Ass'n v. State,* 81 Wn.2d 410, 414–15, 502 P.2d 1170 (1972). The United States Supreme Court approved this ground and also ruled that the injunctions could be justified against nonparties "who interfere with the implementation of court orders establishing public rights . . ." 443 U.S. at 692 n.32, 99 S. Ct. at 3078.

This court recently adopted a similar analysis in upholding the conviction of an Indian fisherman for violation of state fisheries regulations, finding the Puyallup Indian defendant bound by federal court interpretation of the treaty, which justified prosecution for violation of conservation–based regulations. *State v. Reed,* 92 Wn.2d 271, 274, 595 P.2d 916 (1979).

■■ Therefore, we hold that all parties and all those who are in privity with parties must comply with any further federal court proceedings necessary to implement treaty obligations, as defined by the United States Supreme Court. In light of the supremacy clause, noncompliance with any state or federal order or regulation necessary to manage the state's fishery resources in a manner consistent with the Supreme Court's interpretation of treaty fishing rights will not be protected by the courts of this state.

## V

■ Finally, we note that the issue of hatchery fish is not before this court, and that the district court's decision including artificially propagated fish within the treaty–guaranteed shares is binding on the State and all fishermen involved. Although this court has twice asserted in dicta that "it is also inconceivable that either the tribe or the government intended the treaty to create any rights beyond the natural run. . . . [t]his plain language demonstrates that the rights secured to the tribe under the treaty did not encompass artificially propagated sources of fish." *Puyallup* III, *supra* at .682, cited in *Gillnetters, supra* at 690–91, the United States Supreme Court clearly intends the federal courts to resolve the issue of the inclusion of hatchery fish within the share guaranteed by treaty to signatory tribes.

■ The United States Supreme Court did not explicitly rule on the source of fish guaranteed to treaty fishermen, but it did affirm, with minor alterations not material to this issue, the district court's allocation formula. The district court rulings explicitly include wholly hatchery–produced runs, subject to "further consideration" in litigation that is now proceeding in federal court. *United States v. Washington,* 384 F. Supp. 312, 411 (1974). The Supreme Court also explicitly stated that the determination of the inclusion of hatchery fish is in district court hands. 443 U.S. 688 n.30, 99 S. Ct. at 3076. Until the United States Supreme Court decides otherwise and finally supersedes the district court's current interpretation of the nature of

treaty rights in hatchery fish, artificially propagated fish must be considered as part of the guaranteed runs in managing the fisheries in a manner consistent with the United States Supreme Court's interpretation of treaty rights.

Any previous language in our decisions, particularly the statements from *Puyallup* III and *Gillnetters,* set out above, that might be construed as preventing allocation to treaty fishermen of fish in hatchery–produced runs cannot be relied upon to prevent the State from fulfilling its duty to enforce a federal court interpretation of the treaties which does consider artificially propagated fish within the guaranteed share of runs. We act in this regard with the knowledge that negotiations now in progress between the state and federal government will provide federal funds to help relieve the State of part of its run enhancement burden in light of the guaranteed nature of the Indians' treaty rights to fish.

## VI

This opinion is the latest in a long series of decisions assessing the effect of treaties entered into in the forests of Washington Territory over a century ago. The tortured history of these cases in the courts is but a reflection of the economic, social, and emotional anguish this conflict has cast upon the waters of the Puget Sound. In our opinion today we have acknowledged the constitutional validity of the treaties' guaranty to signatory tribes of a portion of anadromous fish runs, and we have held that the state fishery resource regulatory scheme allows allocation which can implement those rights within conservation–only management. We have noted the federal courts' power to enforce the Supreme Court's interpretation of these treaties and have ordered the State and those in privity with it to comply with implementing orders.

These actions are taken in an effort to help end a trauma that has too long affected this state's economic and cultural life. We trust that the affected agencies, groups, tribes, and

individuals will join in that effort and expedite reassumption of the state fishery in a manner consistent with the rights of treaty fishermen as set forth by the Supreme Court of the United States.

We modify our earlier decisions in *Puget Sound Gillnetters Ass'n v. Moos,* 88 Wn.2d 677, 565 P.2d 1151 (1977) and *Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson,* 89 Wn.2d 276, 571 P.2d 1373 (1977) and order the State and the Director in henceforth undertaking management of the state's fisheries to do so in a manner consistent with the United States Supreme Court's treaty interpretations and our opinion here today.

In light of our opinion today, we hereby enter an order affirming that the State "has the authority in managing the anadromous fish resource to do so in a manner which recognizes and gives full force and effect to the Indian treaty fishing rights as defined by the United States Supreme Court and subsequent allocation orders to be entered by the United States District Court for Western Washington pursuant to the remand instructions of the United States Supreme Court." A more explicit formal order is not entered at this time because further proceedings in the federal court may render such an order unnecessary or require changes in any order that might otherwise be entered now. The State and the Director may seek a separate formal order, consistent with our opinion today, if it appears necessary to expedite reassumption of jurisdiction over the affected fisheries after disposition of the United States Supreme Court's mandate to the federal court.

UTTER, C.J., WRIGHT, DOLLIVER, and WILLIAMS, JJ., and RYAN, J. Pro Tem., concur.

ROSELLINI, J. (concurring)—I concur in the result of Justice Horowitz' opinion. I do this not because I believe that the interpretation of the Indian treaties by the United States Supreme Court is correct, but because I am compelled to do so by the supremacy clause of the United

States Constitution. If I were not bound by the supremacy clause, I would adopt Justice Powell's dissent in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979).

BRACHTENBACH and HICKS, JJ., concur with ROSELLINI, J.

Reconsideration denied April 2, 1980.