[No. 49447–9.   En Banc.   September 20, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. ROY
STRITMATTER, ET AL, *Appellants.*

*Ziontz, Pirtle, Morisset, Ernstoff & Chestnut,* by *Samuel
J. Stiltner,* and *Stritmatter, Kessler & McCauley,* by *Keith*

*L. Kessler,* for appellants.

*Michael G. Spencer, Prosecuting Attorney,* for respondent.

PEARSON, J.—Appellants Roy Stritmatter, a fish dealer, and Violet Starr, a member of the Chehalis Indian Tribe, are charged with 10 counts of trafficking in steelhead taken in violation of a closure of the Chehalis River by the Washington State Department of Game. RCW 77.16.040; WAC 232–32–130. Additionally, Starr is charged with buying and selling steelhead without a permit (RCW 77.21.010; WAC 232–12–212), and Stritmatter is charged with the failure to keep a record of steelhead purchased and received from Starr. RCW 77.21.010; WAC 232–12–213.

Appellants were convicted on all counts in Grays Harbor County Superior Court. With the exception of Stritmatter's conviction for failure to keep proper records, we reverse.

In the 1970's, numerous state and federal lawsuits were initiated to determine the fishing rights of those Western Washington Indian tribes which had entered into treaties with the United States. Although several decisions by the United States Supreme Court have resolved numerous issues,[1] the United States District Court for Western Washington has continuing jurisdiction over this fishing rights controversy.

In *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055, *modified on other grounds sub nom. Washington v. United States,* 444 U.S. 816 (1979) (*Fishing Vessel*), the Supreme Court held that treaty Indians have a right to

---

[1]*See Puyallup Tribe v. Department of Game,* 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (*Puyallup* I), *reh'g denied,* 393 U.S. 898 (1968); *Department of Game v. Puyallup Tribe,* 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973) (*Puyallup* II); *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 53 L. Ed. 2d 667, 97 S. Ct. 2616 (1977) (*Puyallup* III); *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055, *modified on other grounds sub nom. Washington v. United States,* 444 U.S. 816 (1979).

take a "fairly apportioned share" of each run of fish passing through tribal fishing areas, both on and off the reservation. *Fishing Vessel,* at 682. This fairly apportioned share is approximately 50 percent of the harvestable fish. *Fishing Vessel,* at 685.

The Washington State Department of Game manages the fishery resources of this state. Pursuant to state statute, and consistent with the federal and state case law, the Department sets limits on the number of steelhead which may be taken by Indian "treaty fishermen" and by "non-treaty fishermen". *See Puget Sound Gillnetters Ass'n v. Moos,* 92 Wn.2d 939, 603 P.2d 819 (1979). The primary goal of the Department's management of steelhead runs is to assure that a sufficient number of fish return upstream to spawn so the optimum run size will be perpetuated in future years.

Each year the Department determines the total number of steelhead which can be caught by all fishermen, Indian and non–Indian, and yet allow a sufficient number of fish to return upstream to spawn. By various means, the Department determines the number of fish caught by Indian and non–Indian fishermen during the open season. Once it is determined that a group has caught its 50 percent share, the river is then closed to further fishing by that group.

In these efforts to manage steelhead runs, the Department of Game issues two types of closure orders. Through "allocation closures", the Department stops the taking of fish by either treaty fishermen or nontreaty fishermen to prohibit one group or the other from taking more than their 50 percent share. A "conservation closure" stops all fishing by both groups to allow the necessary number of fish to return upstream to spawn. The Supreme Court has held that conservation closures operate against Indians, treaty or nontreaty, as well as non–Indians. *Antoine v. Washington,* 420 U.S. 194, 207, 43 L. Ed. 2d 129, 95 S. Ct. 944 (1975).

On January 13, 1981, the Department of Game issued an allocation closure order which provides in relevant part:

WAC 232–32–130 Closure of Nisqually and Chehalis River systems . . . to the taking of steelhead trout with gill nets and seines by *treaty Indians.*

. . .

Data gathered by the Department of Game . . . indicates that the treaty share of harvestable steelhead has been reached or will have been reached on the effective date of this order. Therefore, a closure of Nisqually and Chehalis river systems . . . is necessary to assure non-treaty sports fishermen their right to take their share of those remaining steelhead.

[The following] rule is therefore adopted as an emergency[:]

. . .

It shall be unlawful for all persons to take, fish for, or possess steelhead trout with gill nets and seine gear in the . . . Chehalis River system . . . effective 6:00 p.m., January 14, 1981.

(Italics ours.) Director's Order 121, Dep't of Game (1981).[2]

The "Chehalis River system" referred to in this order runs through the Chehalis Indian Reservation.

Before trial the parties in this case stipulated that all of the steelhead in which the defendants allegedly trafficked were caught on the Chehalis Reservation after the closure order took effect. Evidence at trial indicated the fish were taken by tribal fishermen. The parties also stipulated to the admissibility of expert testimony regarding the Chehalis Tribe's culture, including a description of the tribe's historical commercial fishing practices.

The Chehalis Tribe never entered into a treaty with the United States, as did the other Western Washington tribes involved in the 1970's fishing rights cases. The Chehalis Reservation was created by an 1886 executive order signed by President Grover Cleveland. 1 *Indian Affairs, Laws and*

---

[2]The title of this order refers to "treaty Indians" and the Chehalis Tribe has not entered into a treaty with the United States. Appellants argue that since the title of the order prohibits the taking of steelhead by only treaty Indians, the fish in this case were not caught illegally. Since we reverse appellants' trafficking convictions on other grounds, we find it unnecessary to reach this issue.

*Treaties* 901–04 (J. Kappler ed. 1904). Believing itself exempt from the apportionment required by the holding in *Fishing Vessel* and therefore from the Department's closure order, the tribe continued to take fish from the Chehalis River after the effective date of that order.[3]

## I

We first address the appellants' convictions on 10 counts of trafficking in steelhead taken from the Chehalis River in violation of the closure order. Appellants argue that the closure order did not apply to the Chehalis Tribe; therefore, the fish were neither caught nor sold illegally. The State's position is that nontreaty tribes, including the Chehalis, have the same fishing rights as treaty Indians were determined to have in the 1970's litigation, and therefore, the closure order applied to the Chehalis Tribe.

▮▮ Although nontreaty Indian fishing rights have not been definitively established by statute or court decision, several federal court decisions guide us in clarifying these rights. The executive order establishing the Chehalis Reservation does not specifically reserve the tribe's right to fish on the reservation. The order "set apart" a certain parcel of land "for the use and occupation of the Chehalis Indians." *Indian Affairs, Laws and Treaties,* at 904. This language, "for the use and occupation . . .", has been interpreted in other cases as reserving to the tribe exclusive hunting and fishing rights within the reservation. *See Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 63 L. Ed. 138, 39 S. Ct. 40 (1918); *Menominee Tribe v. United States,* 391 U.S. 404, 20 L. Ed. 2d 697, 88 S. Ct. 1705 (1968).

The scope of these exclusive on–reservation fishing rights depends upon the exercise of those rights prior to the establishment of the reservation. *United States v. Michi-*

---

[3]In March 1983, the Chehalis Tribe filed an action in the United States District Court for Western Washington, seeking a determination of its fishing rights in relation to treaty fishermen and non–Indian fishermen. Our decision involves only the appellants' convictions and does not alter the fishing rights of the Chehalis Tribe.

*gan,* 471 F. Supp. 192, 255–57 (W.D. Mich. 1979), *remanded on other grounds,* 623 F.2d 448 (6th Cir. 1980), *adhered to,* 520 F. Supp. 207 (W.D. Mich.), *on appeal,* 653 F.2d 277 (6th Cir.), *cert. denied,* 454 U.S. 1124 (1981). As noted above, there was evidence stipulated to at trial that the Chehalis Indians historically took fish from this river. Their fishing was not merely for subsistence, but also for commercial purposes.

A well accepted tenet for the construction of Indian treaties is that a treaty is "not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." *United States v. Winans,* 198 U.S. 371, 381, 49 L. Ed. 1089, 25 S. Ct. 662 (1905). When the other Western Washington tribes entered into treaties with the United States, the tribes reserved an exclusive right to fish on the reservation and a right to fish "in common with all citizens of the Territory" at historical fishing areas off the reservation. Treaty of Medicine Creek, Dec. 26, 1854, 10 Stat. 1132, 1133. The Supreme Court held that this language with respect to off–reservation fishing "effects a reservation of a previously exclusive right [but] also recognizes that the right is to be shared in common with the non–Indian 'citizens of the Territory.'" *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 176 n.16, 53 L. Ed. 2d 667, 97 S. Ct. 2616 (1977) (*Puyallup* III). Prior to the treaty in *Puyallup* III, those tribes had exclusive fishing rights in their historical fishing areas. The treaty was a grant by the Indians, allowing other citizens to share in previously exclusive fishing areas.

The executive order forming the Chehalis Reservation does not have the "in common" language of the treaty found in *Puyallup* III. Therefore, the tribe has not granted away any of its exclusive fishing rights. The Chehalis Tribe's fishing rights are similar to those found in *United States v. Michigan, supra.* The tribe there had entered into a treaty which impliedly reserved historical fishing rights, but which did not grant any right to non–Indians to share those rights. The federal court distinguished the treaty

found in *Puyallup* III on the basis of this difference in treaty language and held that the State of Michigan has extremely limited authority to regulate the tribe's right to fish in the Great Lakes. *United States v. Michigan,* 471 F. Supp. at 270. Any regulation must be a necessary conservation measure and must also be the least restrictive means available for preserving area fisheries from irreparable harm. *United States v. Michigan,* 653 F.2d at 279; *accord, Puyallup* III, 433 U.S. at 175.

The closure order in the present case was not necessary for conservation, but instead was an allocation closure, necessary "to assure non-treaty sports fishermen their right to take their share . . ." Since the nontreaty fishing rights of the Chehalis Tribe are subject only to regulations aimed at conserving the species, the closure order here was an invalid exercise of the State's power as it operated against the Chehalis Tribe's on-reservation fishing. Accordingly, Violet Starr's conviction for trafficking in steelhead taken in violation of a closure order is reversed. Roy Stritmatter's trafficking conviction must also be reversed. When Indians have a valid right to sell fish commercially, the State may not interfere with that right by barring sales to non-Indians. *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 398, 20 L. Ed. 2d 689, 88 S. Ct. 1725, *reh'g denied,* 393 U.S. 898 (1968). *See also Pioneer Packing Co. v. Winslow,* 159 Wash. 655, 294 P. 557 (1930).

## II

We next address appellant Violet Starr's conviction for trading in fish without a license pursuant to RCW 77.21.010 and WAC 232-12-212. Appellant calls to our attention two cases in support of her argument that the State is barred from requiring her to possess a license.

In *Tulee v. Washington,* 315 U.S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942), the Supreme Court held that this State could not require members of the Yakima Indian Tribe to buy fishing licenses since it would act "upon the Indians as a charge for exercising the very right their ancestors

intended to reserve." *Tulee,* at 685. The State distinguishes *Tulee* in that the license which appellant failed to obtain is free. WAC 232–12–212.

In *Antoine v. Washington,* 420 U.S. 194, 43 L. Ed. 2d 129, 95 S. Ct. 944 (1975), the Supreme Court held that the State must demonstrate that any regulation imposed on commercial fishing by Indians is a reasonable and necessary conservation measure. *Antoine,* at 207. Although the license is free, and therefore appears not to violate the holding in *Tulee,* the State has failed to offer any proof that the license is reasonable and necessary for conservation purposes as required in *Antoine.* Accordingly, Starr's conviction for trading in fish without a license is reversed.

## III

The final issue we address is appellant Stritmatter's conviction for failure to keep proper records pursuant to RCW 77.21.010 and WAC 232–12–213. The information charged Stritmatter as follows:

> And I, Michael G. Spencer, Prosecuting Attorney, aforementioned, further do accuse Roy Stritmatter of the crime of failure to record purchase and receipt of steelhead trout, a crime of the same or similar character and based on the same conduct as the above counts committed as follows:
>
>> That he, Roy Stritmatter, in Grays Harbor County, Washington, on and between January 26, 1981, and March 7, 1981, while licensed as a wholesale fish dealer and fish buyer, did fail to keep a record of the number of steelhead received and purchased and did fail to maintain a record of such steelhead, in accordance with established rules and regulations, to wit: *Steelhead received and purchased from Violet Starr.*
>
> Contrary to RCW 77.21.010 and WAC 232–12–213 and against the peace and dignity of the State of Washington.

(Italics ours.) Appellant argues that part of the activity alleged in the information—the purchase from Violet Starr—was not proved at trial.

The trial court found that Starr acted as an agent for Stritmatter and aided in his buying, selling and shipping

fish during the closure period. Appellant argues that once the court found this agency relationship it was precluded from finding that he purchased the fish from his agent as alleged in the information. In his memorandum decision, the trial judge treated the language in the information, regarding from whom the fish were purchased, as surplusage:

> Turning to Count XI and defense counsel's comment that defendant Stritmatter could not have "received and purchased" from his own agent, Violet Starr, that language was surplusage. WAC 232–12–213 and underlying statute, RCW 77.21.010, do not include as an element of the offense any reference to where the party acquires the fish. Therefore, I would consider the language merely descriptive and of no consequence unless the defendant was in some way misled or prejudiced. . . .

Stritmatter's defense at trial was that he acted as an agent for Starr during the closure period, and therefore did not personally buy or sell fish. The court rejected this argument and found that Stritmatter was not misled or prejudiced by the surplus language in the information.

The failure to keep proper records of fish purchased and received is the heart of this alleged crime. Stritmatter testified at trial that he handled the steelhead as the agent of Starr; therefore, he could not have been confused as to what fish were involved in this count of the information.

We agree with the trial court that the appellant was not prejudiced by the surplus language in the information. *See State v. Miller,* 71 Wn.2d 143, 146, 426 P.2d 986 (1967); RCW 10.37.056(4).

Appellant Stritmatter's conviction for failure to keep proper records of steelhead purchased and received is affirmed. All other convictions of appellants Starr and Stritmatter are reversed in accord with parts I and II of this opinion.

WILLIAMS, C.J., UTTER, BRACHTENBACH, DOLLIVER, DORE, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.

RoSELLINI, J. (dissenting)—The majority holds that the on–reservation, nontreaty fishing rights of the Chehalis Indian Tribe are not subject to a treaty allocation closure order which prohibits all persons from taking steelhead trout with gillnets and seine gear in the Chehalis River system. The majority bases its decision on a distinction it conceives between allocation and conservation measures.

The United States Supreme Court has held that state conservation closures operate against Indians, treaty or nontreaty, as well as non–Indians. *Antoine v. Washington,* 420 U.S. 194, 207, 43 L. Ed. 2d 129, 95 S. Ct. 944 (1975). The Court has also held that treaty Indians have a right to take a "fairly apportioned share" of each run of fish passing through tribal fishing areas, both on and off the reservation. *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 682, 61 L. Ed. 2d 823, 99 S. Ct. 3055, *modified on other grounds sub nom. Washington v. United States,* 444 U.S. 816 (1979) (*Fishing Vessel*). This fairly apportioned share is approximately 50 percent of the harvestable fish. *Fishing Vessel,* at 685.

In an effort to manage the steelhead fishery in accordance with sound conservation techniques and treaty obligations, the Department of Game sets limits on the number of steelhead which may be taken by Indian "treaty fishermen" and by "nontreaty fishermen". *See Puget Sound Gillnetters Ass'n v. Moos,* 92 Wn.2d 939, 603 P.2d 819 (1979).

Each year the Department determines the total number of steelhead which can be caught by all fishermen, treaty and nontreaty, and yet allow a sufficient number of fish to return upstream to spawn. By various means, the Department determines the number of fish caught by treaty and nontreaty fishermen during the open season. Once it is determined that a group has caught its 50 percent share, the river is then closed to further fishing by that group.

In these efforts to manage steelhead runs, the Department of Game issues two types of closure orders. Through "allocation closures", the Department stops the taking of

fish by either treaty fishermen or nontreaty fishermen to prohibit one group or the other from taking more than their 50 percent share. A "conservation closure" stops all fishing by both groups to allow the necessary number of fish to return upstream to spawn.

On January 13, 1981, the Department of Game issued a closure order which provides in relevant part:

> WAC 232–32–130 Closure of Nisqually and Chehalis River systems . . . to the taking of steelhead trout with gill nets and seines by *treaty Indians.*

> . . .

> Data gathered by the Department of Game . . . indicates that the treaty share of harvestable steelhead has been reached or will have been reached on the effective date of this order. Therefore, a closure of Nisqually and Chehalis river systems . . . is necessary to assure non-treaty sports fishermen their right to take their share of those remaining steelhead.

> [The following] rule is therefore adopted as an emergency[:]

> . . .

> It shall be unlawful for all persons to take, fish for, or possess steelhead trout with gill nets and seine gear in the . . . Chehalis River system . . . effective 6:00 p.m., January 14, 1981.

(Italics mine.) Director's Order 121, Dep't of Game (1981).

The "Chehalis River system" referred to in this order runs through the Chehalis Indian Reservation. The majority holds that this closure, being in the form of a treaty allocation measure, is inapplicable to the nontreaty Chehalis Indian Tribe. This distinction is inappropriate. The overall management technique is to assure the perpetuation of the steelhead run for both treaty and nontreaty fishermen. This treaty fishing closure not only assures a catch for nontreaty fishermen but assures the perpetuation of the run by prohibiting the use of gillnets and seine gear on the Chehalis River system.

The Chehalis Indian Tribe has rights no different than other fishermen when the purpose of a closure is to effectu-

ate treaty obligations and to assure conservation of the species.

This is such a case and I would affirm the convictions.

Reconsideration denied November 15, 1984.