IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 78176-6-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| KAREY ANN HINKSON, | |
| Appellant. | FILED: September 23, 2019 |

ANDRUS, J. — Karey Ann Hinkson appeals her conviction for first degree identity theft. She contends the charging document was constitutionally deficient for omitting an essential element of that crime. She also challenges a community custody condition that bars her from possessing identifying information of others, arguing that the condition exceeds the trial court's statutory and constitutional authority. Finally, she challenges the imposition of a filing fee and DNA collection fee. We remand to the trial court to clarify the community custody condition and to strike the filing fee and DNA collection fee. We otherwise affirm Hinkson's judgment and sentence.

## FACTS

In May 2013, MacPherson's Property Management, Inc. (MacPherson's) contacted Bank of America to report that numerous fraudulent checks had posted to its account. An internal investigation revealed that between May 13 and May 18, 2013, seven individuals had cashed a total of 38 counterfeit MacPherson's checks, primarily at

Bank of America branches located around the greater Everett area. The cashed checks ranged in value from $923.07 to $1,745.80, for a total of $49,052.77.

Detective Jamie French of the Everett Police Department's financial crimes unit began investigating the fraudulent MacPherson's checks, and Hinkson's possible involvement. On June 1, 2013, police served a search warrant on the residence Hinkson shared with Kenneth Beaman. They recovered laptop computers, data storage devices, printers, CDs, and materials for producing forged items. Hinkson denied producing or distributing forged checks at that time.

As a result of information gathered in the first search, police developed probable cause to conduct a second search of the residence on June 12, 2013 based on fraudulent check activity involving the Washington State Urology Society. When police entered the residence, they found Hinkson kneeling in front of the fireplace burning blank check stock and other items. That search yielded additional items including laptops, cell phones, and a data storage card containing images of multiple driver's licenses. Further forensic analysis of these items revealed evidence of attempts to make false driver's licenses using other people's information, including that of Rachel Ward. During a subsequent interview with police, Hinkson admitted using the stolen credit card and identification of Lindsay Mullett to shop at Macy's.

On December 13, 2013, police served a third search warrant at Hinkson and Beaman's residence. They recovered more computers, hard drives, fake identifications, stolen mail belonging to other people, receipts corresponding to known fraudulent transactions, checks, and other indicia of financial crimes. In an interview, Hinkson admitted her involvement in a fraudulent check cashing ring involving multiple victims,

including MacPherson's and the Washington Urology Society. Hinkson asserted that Beaman directed her to create counterfeit checks made out to various named payees. At trial, the State presented testimony that Hinkson or Beaman drove payees to the bank, then waited in the car while the payee cashed the fraudulent check in exchange for a portion of the proceeds.

On July 22, 2016, the State filed a third amended information charging Hinkson with the following five counts: (1) first degree identity theft relating to MacPherson's, (2) first degree identity theft relating to the Washington State Urology Society, (3) forgery relating to MacPherson's, (4) second degree identity theft relating to Lindsay Mullett, and (5) second degree identity theft relating to Rachel Ward. The jury acquitted Hinkson on two of the identity theft charges, but found her guilty on one count of identity theft in the first degree relating to MacPherson's, one count of identity theft in the second degree relating to Rachel Ward, and one count of forgery, also relating to MacPherson's. The court imposed a standard range sentence of 84 months confinement plus 12 months of community custody. As a condition of community custody, the court ordered that Hinkson "not possess identifying information of others." Hinkson appeals only the conviction for identity theft in the first degree and portions of the sentence.

## DISCUSSION

### 1. Sufficiency of Charging Document

For the first time on appeal, Hinkson argues that the amended information charging her with first degree identity theft was constitutionally deficient because it failed to specify that she committed multiple acts of identity theft as part of a common scheme or plan.

We review the adequacy of a charging document de novo. State v. Williams, 162 Wn.2d 177, 182, 170 P.3d 30 (2007).

Criminal defendants have a constitutional right to be informed of the nature and cause of the charges against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To be constitutionally sufficient, a charging document must include all essential elements of a crime, both statutory and nonstatutory, so as to inform a criminal defendant of the charges and to allow the defendant to prepare a defense. State v. Kjorsvik, 117 Wn.2d 93, 97, 812 P.2d 86 (1991). "An 'essential element' is one whose specification is necessary to establish the very illegality of the behavior charged.' " State v. Zillyette, 178 Wn.2d 153, 158, 307 P.3d 712 (2013) (quoting State v. Ward, 148 Wn.2d 803, 811, 64 P.3d 640 (2003)). "The purpose of this essential elements rule is to sufficiently apprise the defendant of the charges against them so that he or she may prepare a defense." State v. Kosewicz, 174 Wn.2d 683, 691, 278 P.3d 184 (2012).

When a defendant challenges the sufficiency of a charging document for the first time on appeal, we liberally construe it in favor of validity. Kjorsvik, 117 Wn.2d at 105. To determine the sufficiency of the information, we apply the two-prong Kjorsvik test: "(1) do the necessary facts appear in any form, or by fair construction can they be found, in the charging document; and, if so, (2) can the defendant show that he or she was nonetheless actually prejudiced by the inartful language which caused a lack of notice?" Kjorsvik, 117 Wn.2d at 105–06. If the necessary elements are not found or cannot be fairly implied on the face of the information, prejudice is presumed and the conviction must be reversed. State v. Brown, 169 Wn.2d 195, 198, 234 P.3d 212 (2010).

The crime of identity theft is defined as follows: "No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime." RCW 9.35.020(1). The crime is identity theft in the first degree if the offender "obtains credit, money, goods, services, or anything else of value in excess of [$1,500] in value . . . ." RCW 9.35.020(2). Otherwise, the crime is identity theft in the second degree. RCW 9.35.020(3). In addition, the State may charge a defendant with identity theft in the first degree by aggregating the value of multiple lesser transactions to surpass the $1,500.00 threshold, as follows:

> Whenever any series of transactions involving a single person's means of identification or financial information which constitute identity theft would, when considered separately, constitute identity theft in the second degree because of value, *and the series of transactions are a part of a common scheme or plan*, then the transactions may be aggregated in one count and the sum of the value of all of the transactions shall be the value considered in determining the degree of identity theft involved.

RCW 9.35.020(5) (emphasis added).

Here, the third amended information alleged Hinkson committed identity theft in the first degree as follows:

> Count 1: FIRST DEGREE IDENTITY THEFT committed as follows: That the defendant, on or about the 13th day of May, 2013 through the 18th day of May, 2013, did knowingly obtain, possess, use and transfer a means of identification and financial information of a person, to wit: MacPherson's Property Management Inc., with the intent to commit, aid, and abet a crime, to-wit: Forgery and Theft, and the defendant or an accomplice used such person's means of identification and financial information to obtain credit, money, goods, services, and other things having an aggregate value totaling more than $1,500.00; proscribed by RCW 9.35.020(1) and (2), a felony.

Hinkson, relying on State v. Rivas, 168 Wn. App. 882, 278 P.3d 686 (2012), contends that when the State aggregates the value of a series of lesser transactions to

reach the $1,500 threshold for first degree identity theft, a "series of transactions" that are "a part of a common scheme or plan" is an essential element of the crime that must be alleged in the information. In Rivas, the State charged the defendant with malicious mischief in the second degree for causing damage to two vehicles owned by the same individual. Id. at 885. RCW 9A.48.100(2) allows the State to aggregate damages to reach the $750 threshold for malicious mischief in the second degree if the defendant damaged more than one item of property pursuant to a "common scheme or plan." In that case, the State had to aggregate the value of the damage to each vehicle in order to reach the $750 threshold necessary to prove the crime. Rivas at 889. The charging document, however, did not allege that the crimes were committed as part of a "common scheme or plan." Id. at 890. The court held that "a common scheme or plan is an essential element of second degree malicious mischief where the State aggregates the value of damages to more than one item of property." Id. at 889. Because the charging document failed to allege this essential element, reversal was required. Id. at 890–91.

Hinkson points out that the identity theft statute contains an aggregation provision similar to the malicious mischief statute that increases multiple second degree crimes into a first degree crime. See RCW 9.35.020(5). Hinkson therefore asserts that that the information charging her with identity theft in the first degree was deficient because it failed to allege that she conducted a "series of transactions" that were "part of a common scheme or plan" as required by RCW 9.35.020(5). Because those essential elements in question were entirely missing from the information, Hinkson asserts that prejudice is presumed and reversal is required.

The State acknowledges that "common scheme or plan" is an essential element of the crime, but that the missing element may be implied from a common sense reading of the allegation that Hinkson used MacPherson's "identification and financial information . . . to obtain credit, money, goods, services, and other things having an *aggregate* value totaling more than $1,500.00." According to the State, this language reasonably implies that the information charged Hinkson with committing multiple acts of identity theft against a single victim throughout the five-day charging period pursuant to a common scheme or plan.

Both parties appear to assume that the State had to aggregate the value of the 38 counterfeit MacPherson's checks in order to reach the $1,500 threshold necessary to charge Hinkson with identity theft in the first degree. Had none of the MacPherson's checks exceeded $1,500 in value, aggregation would indeed be required to prove the crime as charged. But the record shows that three of the 38 MacPherson's checks were written in an amount over $1500. These include: (1) check number 30800 in the amount of $1,745.25; (2) check number 30845 in the amount of $1,745.80; and (3) check number 30767 in the amount of $1,575.00. All three checks were introduced as evidence at trial. Because the State did not need to aggregate the value of the individual checks to reach the $1,500 threshold for first degree identity theft, it did not need to allege that the transactions were "part of a common scheme or plan" under RCW 9.35.020(5).

"[W]here unnecessary language is included in an information, the surplus language is not an element of the crime that must be proved unless it is repeated in the jury instructions." State v. Tvedt, 153 Wn.2d 705, 718, 107 P.3d 728 (2005). "Nor is the information insufficient as a charging document if the defendant is not prejudiced by the

inclusion of the unnecessary language." Id. at 718 (citing State v. Stritmatter, 102 Wn.2d 516, 524, 688 P.2d 499 (1984). Surplusage is not prejudicial to the defendant unless she is confused or misled as to what conduct is the basis of the charge. Stritmatter, 102 Wn.2d at 524.

Here, the to-convict jury instructions state, in relevant part:

To convict the defendant of the crime of identity theft in the first degree as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 13th day of May, 2013, through the 18th day of May, 2013, the defendant knowingly obtained, possessed, or transferred or used a means of identification or financial information of another person;

(2) That the defendant did so with the intent to commit or to aid or abet the crimes of forgery or theft;

(3) That the defendant knew that the means of identification or financial information belonged to another person;

(4) That the defendant or an accomplice obtained credit, money, goods, services, or anything else in excess of $1,500 in value from the acts described in element (1); and

(5) That any of these acts occurred in the State of Washington.

Significantly, this instruction did not state that the State needed to prove that the transactions had an "aggregate value totaling" over $1,500.[1] Nor was Hinkson prejudiced by the inclusion of the surplus language. Hinkson's defense at trial was that she was

---

[1] During opening and closing argument, the prosecutor noted that the total loss from the MacPherson's checks was in excess of $50,000. But the State did not expressly argue that it aggregated multiple second degree identity thefts to reach the threshold for first degree identity theft. The prosecutor's argument was not inconsistent with the evidence or with the language in the information or the to-convict instruction.

merely present while others made the counterfeit checks and that the witnesses were not credible.

In sum, the State was not required to aggregate multiple second degree identity thefts to charge Hinkson with first degree identity theft. The surplus language in the information may be disregarded. The information properly included all essential elements of the crime of identity theft in the first degree.

2. Community Custody Condition

Hinkson argues that the community custody condition restricting her from "possess[ing] identifying information of others" exceeds the court's statutory and constitutional authority and must be stricken. Although Hinkson did not object to this condition below, she may challenge it for the first time on appeal. State v. Bahl, 164 Wn.2d 739, 744, 193 P.3d 678 (2008). We review a trial court's imposition of crime-related prohibitions for abuse of discretion. State v. Cordero, 170 Wn. App. 351, 373, 284 P.3d 773 (2012). A court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. State v. Riley, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993).

Courts may "impose and enforce crime-related prohibitions and affirmative conditions" as part of any sentence. RCW 9.94A.505(9). A "'[c]rime-related prohibition' . . . prohibit[s] conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). There is no abuse of discretion if a "reasonable relationship" exists between the crime of conviction and community custody condition. State v. Nguyen, 191 Wn.2d 671, 684, 425 P.3d 847 (2018) (quoting State v. Irwin, 191 Wn. App. 644, 658-59, 364 P.3d 830 (2015). "So long

9

as it is reasonable to conclude that there is a sufficient connection between the prohibition and the crime of conviction, we will not disturb the sentencing court's community custody conditions." Nguyen, 191 Wn.2d at 685-86.

There is ample evidence that Hinkson used the identifying information of others to commit identity theft. She was found in possession of multiple items of the identifying information of others, including a data storage card containing images of multiple driver's licenses and attempts to make false driver's licenses using other's information. And overwhelming evidence at trial showed that Hinkson used MacPherson's information to make counterfeit checks, which she gave to others to cash. In addition, the trial court was aware that Hinkson had a lengthy criminal history with multiple convictions for identity theft and forgery. Some restriction on Hinkson's possession of other people's identifying information was plainly appropriate.

Hinkson contends that the condition is not reasonably crime-related because it bars any possession of the information of others, rather than being limited to illegal possession or use. For the same reason, Hinkson further asserts that the condition is void for vagueness. "A community custody condition is unconstitutionally vague if either '(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement.'" State v. Wallmuller, 4 Wn. App.2d 698, 701, 423 P.3d 282 (2018) (quoting State v. Padilla, 190 Wn.2d 672, 677, 416 P.3d 712 (2018)). "The imposition of an unconstitutionally vague condition is an abuse of the trial court's discretion." State v. Johnson, 180 Wn. App. 318, 326, 327 P.3d 704 (2014).

The State concedes that the phrase "identifying information" could encompass a wide range of information, some of which the trial court may not have intended to restrict the defendant from possessing. We agree. The condition could allow Hinkson to be punished for otherwise lawful possession of the identifying information of others, such as holding a relative's credit card, checkbook, or passport with their knowledge and permission. We therefore strike the condition as void for vagueness and grant the State's request to remand to the trial court for resentencing to correct the error by narrowing or clarifying the condition.

3. Legal Financial Obligations

Hinkson seeks to strike the $100 DNA fee and $200 filing fee from the judgment and sentence. The State concedes that, while these legal financial obligations were properly imposed at the time of sentencing, they should be stricken pursuant to recently amended RCW 36.18.020, RCW 43.43.7541, and State v. Ramirez, 191 Wn.2d 732, 426 P.3d 714 (2018). We accept the State's concession and agree.

We remand to the trial court to clarify the community custody condition and to strike the $100 DNA fee and $200 filing fee. We otherwise affirm Hinkson's convictions and sentence.

Affirmed in part and remanded.


WE CONCUR:

_Andrus, J._

_Mann, ACJ_

_Appelwick, C.J._